TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




ON MOTION FOR REHEARING







NO. 03-02-00644-CV

NO. 03-02-00701-CV






Texas Municipal Power Agency; City of Denton, Texas; City of Garland, Texas;

and City of Greenville, Texas, Appellants


v.


Public Utility Commission of Texas and City of Bryan, Texas, Appellees


&


Texas Municipal Power Agency; City of Denton; City of Garland; and GEUS f/k/a 


Greenville Electric Utility System, Appellants



v.



Public Utility Commission of Texas; City of Bryan; and City of Weatherford, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NOS. 99-11127 & 99-14787, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING






O P I N I O N



 To address concerns raised in appellants' motions for rehearing, we withdraw our
original opinion and judgment issued January 29, 2004, and substitute the following in its place. In
this combined appeal, we must decide whether appellee the Public Utility Commission of Texas had
jurisdiction to determine whether the terms on which appellant Texas Municipal Power Agency
("TMPA") allocated wholesale costs for transmission of electricity to appellee City of Bryan, Texas
("Bryan") were reasonable. Bryan and appellants, City of Denton, Texas; City of Garland, Texas;
and GEUS f/k/a Greenville Electric Utility System (collectively, "Northern Cities"), are the four
member cities of TMPA, an entity created to provide electricity to these cities.

 In three issues, TMPA, joined by the Northern Cities, contends that the Commission
was without jurisdiction to make any determination about wholesale transmission costs because in
so doing it impermissibly altered the terms of TMPA's contract with Bryan. (1) TMPA further asserts
that the district court erred in dismissing its request for declaratory relief that the Commission lacked
jurisdiction over this dispute. For the reasons set forth below, we affirm the judgments of the district
court.


BACKGROUND


Early Wholesale Transmission Rate Proceedings

 A discussion of the history leading to the Commission proceedings at issue will be
helpful in putting TMPA's arguments in context. In 1995, the legislature enacted the Public Utility
Regulatory Act ("PURA95") to promote competition in the wholesale electricity market. Public
Util. Comm'n v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 312 (Tex. 2001) [hereinafter
"San Antonio"]. The electric industry has three principal components: generation, transmission, and
distribution of power. PURA95 required the Commission to adopt rules "relating to wholesale
transmission service, rates, and access." (2) The Commission in turn adopted rules governing
wholesale transmission. See 21 Tex. Reg. 1397 (1996) (adopting 16 Tex. Admin. Code § 23.67)
[hereinafter rule 23.67], and 21 Tex. Reg. 3343 (1996) (adopting 16 Tex. Admin. Code § 23.70)
[hereinafter rule 23.70]. These rules required each ERCOT (3) utility to pay every other ERCOT utility
a "facilities charge" for transmission service.

 The Commission then established matrices setting the net charges each utility would
pay other ERCOT utilities for providing wholesale transmission service in 1997 and 1998. See Tex.
Pub. Util. Comm'n, Regional Transmission Proceeding to Establish Postage Stamp Rate and
Statewide Loadflow Pursuant to Substantive Rule 23.67, Docket No. 15840 (Aug. 11, 1997) (final
order establishing rates) [hereinafter "1997 rate-setting proceeding"]; Tex. Pub. Util. Comm'n,
Proceeding to Modify ERCOT Transmission Rates for 1998 Pursuant to Substantive Rule 23.67,
Docket No. 18459 (June 26, 1998) (final order establishing rates) [hereinafter "1998 rate-setting
proceeding"]. A Travis County district court reviewed these orders, and, in the interim, the Texas
Supreme Court invalidated portions of rule 23.67 on the ground that chapter 35 of PURA gave the
Commission only an oversight role over a municipally owned utility's wholesale transmission rates,
not the authority to dictate the rates by rule. San Antonio, 53 S.W.3d at 320-21. Because of the
supreme court's disposition, the district court in October and November 2003 reversed and remanded
these orders to the Commission for further proceedings.


Bryan's 1998 Complaint Against TMPA

 In 1976, TMPA entered into four identical power sales contracts to sell power at
wholesale prices to Bryan and the Northern Cities. TMPA is a municipally owned utility, which is
defined as "owned, operated, and controlled by a municipality or by a nonprofit corporation the
directors of which are appointed by one or more municipalities." Tex. Util. Code Ann. § 11.003(11)
(West 1998) [hereinafter "PURA § ____"]. Its board of directors is composed of two representatives
from each of the member cities. Each city is also a municipally owned utility and a TMPA customer
by contract. Under the contracts, TMPA provides electricity to each of the cities at designated points
of delivery.

 TMPA's transmission of electricity to the Northern Cities involved both TMPA lines
and the lines of another utility, whereas transmission of electricity to Bryan involved only TMPA
lines. The Commission's 1997 and 1998 wholesale transmission rate orders caused the Northern
Cities to bear greater costs for transmission than they had before. A majority of the TMPA board
of directors, outvoting Bryan six to two, passed a resolution requiring TMPA to reimburse the
Northern Cities for a certain amount of the transmission charges that they bore under the
Commission's orders. This led to an increase in TMPA's budget and in turn a reallocation of
TMPA's charges to all of the member cities.

 In July 1998, Bryan filed a complaint with the Commission against TMPA, alleging
that the board's actions required it to pay a portion of the Northern Cities' transmission costs,
causing it to pay more for transmission service than the Commission's transmission orders required. 
Bryan argued that under the 1997 rate-setting proceeding, each city could "nominate" its own load
for power supplied by TMPA, that is, specify how much wholesale transmission service it would
need to provide power to its customers. In this way, Bryan contended, the cities treated their
contracts with TMPA as "unbundled," meaning that TMPA charged them separately for generation,
transmission, and distribution of electricity.

 Bryan, concerned that the board might attempt to "rebundle" the contracts, sought a
declaration that it could continue to nominate its own load for power supplied by TMPA and that,
if it chose to do so, it would not be treated as a bundled wholesale customer of TMPA. TMPA
responded that it, not the member cities, bore all costs of transmission under the power sales
contracts. TMPA further argued that the Commission lacked the authority to unbundle the rate that
it charged the cities, because the contracts required a bundled rate.

 The Commission decided in Bryan's favor that Bryan was authorized to nominate its
own load and was obligated to pay only those transmission charges established by the Commission. 
See Tex. Pub. Util. Comm'n, Complaint of the City of Bryan, Texas Against Texas Municipal Power
Agency and the Cities of Denton, Garland and Greenville, Texas, Docket No. 19585 (Jul. 9, 1999)
(final order) [hereinafter "Bryan's complaint proceeding"]. TMPA sought judicial review of the
order in a Travis County district court. The district court reversed and remanded the proceedings
to the Commission, due in part to the holding in the San Antonio case in 2001 invalidating the
Commission's authority to set the wholesale transmission rates of municipally owned utilities. The
district court's disposition of Bryan's complaint proceeding is the subject of this appeal in cause
number 03-02-00644-CV.


1999 Wholesale Transmission Rate Proceeding

 In October 1999, the Commission established a matrix of wholesale transmission
charges for 1999. Pub. Util. Comm'n, Proceeding to Modify ERCOT Transmission Rates for 1999
Pursuant to Substantive Rule 23.67, Docket No. 20381 (Oct. 13, 1999) (final order on rehearing
establishing rates) [hereinafter "1999 rate-setting proceeding"]. Pursuant to its holding in Bryan's
complaint proceeding, the Commission held in the 1999 proceeding that Bryan was "entitled to
unbundled transmission service and to nominate the resources that will be used to serve its loads." 
Id. at 1. In the meantime, effective September 1, 1999, the legislature amended PURA ("PURA99"),
in part by adding statutory provisions in chapter 40 governing municipally owned utilities. Thus,
PURA95 governs the first eight months of the 1999 rate-setting proceeding, whereas PURA99
governs the last four months of the proceeding.

 TMPA sought judicial review of the 1999 rate-setting order in a Travis County district
court. The district court reversed and remanded the proceedings to the Commission, due in part to
the holding in the San Antonio case in 2001 invalidating the Commission's authority to set the
wholesale transmission rates of municipally owned utilities. The district court's disposition of the
1999 rate-setting proceeding is the subject of this appeal in cause number 03-02-00701-CV.

Issues on Appeal

 By three issues, TMPA contends that the district court erred in reversing and
remanding to the Commission the order concerning Bryan's complaint and portions of the 1999 rate-setting order. All of TMPA's issues hinge on the assertion that the Commission lacks the authority
both to adjudicate contract rights between TMPA and Bryan and to set wholesale transmission rates
for a municipally owned utility. In its first issue, TMPA asserts that the district court erred in
dismissing TMPA's request for a declaration that the Commission lacked jurisdiction. TMPA's
argument relies in part on the disposition of TMPA's interlocutory appeal of a related Commission
matter, in which this Court held that TMPA's administrative appeal did not deprive the district court
of jurisdiction to consider TMPA's request for declaratory relief. See Texas Mun. Power Agency v.
Public Util. Comm'n, 100 S.W.3d 510, 520-21 (Tex. App.--Austin 2003, pet. denied).

 In its second issue, TMPA contends that the district court erred in granting Bryan's
motion for partial summary judgment that as a matter of law chapter 35 of PURA conferred
jurisdiction on the Commission to determine whether the terms on which TMPA provided
transmission services to Bryan were reasonable. TMPA asserts that this holding was in error because
TMPA does not provide transmission services to Bryan and, moreover, the Commission lacked
jurisdiction to make the determination. In its third issue, TMPA contends that the district court erred
in denying its motion for partial summary judgment that the Commission lacked jurisdiction over
the matters at issue between TMPA and Bryan.


ANALYSIS


Jurisdiction of the Commission under Chapter 35 of PURA

 TMPA's second and third issues pertain to the district court's grant in both
proceedings of one point of Bryan's motion for partial summary judgment and the denial of TMPA's
motion for partial summary judgment. The standards for review of a summary judgment are well
established: the movant must show there is no genuine issue of material fact and that it is entitled
to judgment as a matter of law. See Tex. R. Civ. P. 166a(c); Pustejovsky v. Rapid-Am. Corp., 35
S.W.3d 643, 645-46 (Tex. 2000); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex.
1985). Here, the parties rely on statutory provisions to support their entitlement to summary
judgment. In general, matters of statutory construction are questions of law rather than issues of fact. 
City of Garland v. Dallas Morning News, 22 S.W.3d 351, 357 (Tex. 2000).

 Generally, a party cannot appeal the denial of a motion for summary judgment
because it is an interlocutory order and thus not appealable. See Cincinnati Life Ins. Co. v. Cates,
927 S.W.2d 623, 625 (Tex. 1996). However, when both parties move for summary judgment and
the district court grants one motion and denies the other, the unsuccessful party may appeal both the
prevailing party's motion and the denial of its own. See Holmes v. Morales, 924 S.W.2d 920, 922
(Tex. 1996). We will review the summary judgment evidence presented by both sides, determine
all questions presented, and render such judgment as the trial court should have rendered. 
Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). When, as here, a trial court grants
summary judgment on a specific ground, we should consider all summary judgment grounds that the
trial court ruled on, are preserved for review, and are necessary for a final disposition of the appeal.
Cates, 927 S.W.2d at 625-26. We review the trial court's decision to grant summary judgment de
novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994).

 Bryan's motion for partial summary judgment was granted on the sole ground that
"as a matter of law, PURA Ch. 35 conferred jurisdiction on the [Commission] to determine whether
the terms on which TMPA provided transmission service were reasonable." The parties agree that
this requires us to apply principles of statutory construction in examining whether chapter 35 of
PURA conferred jurisdiction on the Commission to make this determination.

 Statutory construction is a question of law, which we review de novo. Texas Dep't
of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002). We must ascertain and give effect to the
legislature's intent for the provision we are construing. See Fleming Foods v. Rylander, 6 S.W.3d
278, 284 (Tex. 1999); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280 (Tex. 1994); Calvert
v. Texas Pipe Line Co., 517 S.W.2d 777, 780 (Tex. 1974). The legislature's intent is determined by
reading the language used in the particular statute and construing the statute in its entirety. See In
re Bay Area Citizens Against Lawsuit Abuse, 982 S.W.2d 371, 380 (Tex. 1998); Taylor v. Firemen's
& Policemen's Civil Serv. Comm'n, 616 S.W.2d 187, 190 (Tex. 1981). Further, we read every word,
phrase, and expression in a statute as if it were deliberately chosen, and presume the words excluded
from the statute are done so purposefully. See Gables Realty Ltd. P'ship v. Travis Cent. Appraisal
Dist., 81 S.W.3d 869, 873 (Tex. App.--Austin 2002, pet. denied); City of Austin v. Quick, 930
S.W.2d 678, 687 (Tex. App.--Austin 1996) (citing Cameron v. Terrell & Garrett, Inc., 618 S.W.2d
535, 540 (Tex. 1981)), aff'd, 7 S.W.3d 109 (Tex. 1999); see also 2A Norman J. Singer, Sutherland
Statutory Construction § 47.25 (6th ed. 2000) (stating that there is generally an inference that
omissions from a statute are intentional).

 The supreme court cautions that, in construing statutes


 [c]ourts must take statutes as they find them. . . . They should search out carefully
the intendment of a statute, giving full effect to all of its terms. But they must find
its intent in its language and not elsewhere. . . . They are not responsible for
omissions in legislation. They are responsible for a true and fair interpretation of the
written law.



RepublicBank Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605, 607 (Tex. 1985) (quoting Simmons v.
Arnim, 220 S.W. 66, 70 (Tex. 1920)). Because canons of statutory construction may be cited to
support conflicting interpretations of a disputed statute, we look to "the good sense of the situation
and a simple construction of the available language to achieve that sense, by tenable means, out of
the statutory language." Karl N. Llewellyn, Remarks on the Theory of Appellate Decision and the
Rules or Canons About How Statutes are to be Construed, 3 Vand. L. Rev. 395, 401 (1950).

 In ascertaining the scope of an agency's authority, we give great weight to the
contemporaneous construction of a statute by the administrative agency charged with its
enforcement. State v. Public Util. Comm'n, 883 S.W.2d 190, 197 (Tex. 1994) (citing Dodd v. Meno,
870 S.W.2d 4, 7 (Tex. 1994); Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993)).
We recognize that the legislature intends an agency created to centralize expertise in a certain
regulatory area "be given a large degree of latitude in the methods it uses to accomplish its regulatory
function." Id.

 Before addressing TMPA's second and third issues, we must be mindful of what is
not before us. First, we are not asked to determine whether the Commission's orders were correct. 
Second, we are not asked to decide any contractual issues between TMPA and Bryan. Instead, the
task before us is to decide the narrow question of whether chapter 35 of PURA conferred jurisdiction
on the Commission to determine whether the terms on which TMPA provided transmission services
to Bryan were reasonable. The parties agree on three matters concerning this question: the only
source of the Commission's jurisdiction is chapter 35; this chapter confers at least limited
jurisdiction on the Commission; and we should resolve the jurisdictional issue. We thus turn to an
examination of the provisions of chapter 35.

 What became chapter 35 of PURA in 1997 was originally enacted as part of Title II
of PURA95. (4) The purpose of Title II was to foster competition in the wholesale electric market and
"establish a comprehensive regulatory system . . . to assure rates, operations, and services that are
just and reasonable to consumers and to the utilities." (5) Chapter 35 "required all transmission-owning
utilities to provide 'open access' to their transmission facilities for wholesale transmission." San
Antonio, 53 S.W.3d at 312-13.

 The supreme court held in San Antonio that "all powers that chapter 35 gives to the
Commission extend to municipally owned utilities." Id. at 318; see PURA § 35.001 ("In this
subchapter, 'electric utility' includes a municipally owned utility."). Chapter 35 gives the
Commission the express power to


 ensure that an electric utility provides nondiscriminatory access to wholesale
transmission service for qualifying facilities, exempt wholesale generators, power
marketers, and other electric utilities; (6)


 ensure that the electric utility recovers its reasonable costs in providing wholesale
transmission services necessary for the transaction from the entity for which
transmission is provided so that the utility's other customers do not bear the costs
of the service; (7)


 require an electric utility to provide transmission service at wholesale to another
electric utility, a qualifying facility, an exempt wholesale generator, or a power
marketer and . . . determine whether the terms for the transmission service are
reasonable; (8)


 adopt rules relating to wholesale transmission service, rates, and access; (9) and


 require that each party to a dispute concerning prices or terms of wholesale
transmission service engage in a nonbinding alternative dispute resolution
process before seeking resolution of the dispute by the commission. (10)



See San Antonio, 53 S.W.3d at 319-20. Chapter 35 does not, however, give the Commission the
authority to set wholesale transmission rates for municipally owned utilities. Id. at 321. Instead,
chapter 35 gives the Commission "largely an oversight role . . . with respect to wholesale
transmission transactions." Id. at 320. "By its plain language, the statute anticipates disputes
between individual utilities about the price for wholesale transmission service . . . . Should the
parties not be able to agree on the terms for service, they can turn to the Commission." Id. We now
turn to an examination of whether the assertions in Bryan's complaint against TMPA fall within the
Commission's jurisdiction under chapter 35.

 In its complaint, Bryan contended that the TMPA board's actions in reallocating
expenses violated the orders in the 1997 and 1998 rate-setting proceedings because the actions
resulted in charging Bryan a higher rate for wholesale transmission than permitted under those
orders. Bryan further asserted that the board actions violated several provisions of PURA chapter
35:


 The attempt by the Northern Cities to use TMPA to reassign their . . . costs to Bryan
causes TMPA to be in violation of PURA Sections 35.003, 35.004 and 35.005.
Section 35.003 prohibits TMPA from granting a preference to any person in
connection with the purchase or sale of electric energy at wholesale. The rate
resolution violates this section because it grants a preference to the three Northern
Cities by lowering their transmission costs at Bryan's expense. The rate resolution
also violates Sections 35.004(a) and 35.004(b) of PURA. Section 35.004(a) requires
transmission service rates charged by an electric utility to be comparable to the rates
charged by the utility for the use of its system. Section 35.004(b) requires that an
electric utility's transmission rates be non-discriminatory. The rate resolution
violates these sections because it results in lower transmission rates for some users
(the three Northern Cities) than for other users (Bryan . . .), rather than in
"comparable" rates. This action also violates Section 35.004(c) of PURA, which
precludes an electric utility from shifting transmission costs from one customer to
another customer, in that it causes Bryan to bear the transmission costs of TMPA's
other customers, the three Northern Cities.


 The resolution also violates PURA Section 35.005, which requires transmission
service rates to be reasonable, in that the resulting rates are not reasonable.



 TMPA conceded at oral argument that it does not generally dispute the Commission's
jurisdiction over wholesale transmission rates. TMPA asserts, however, that the Commission lacked
jurisdiction because TMPA does not provide wholesale transmission service to Bryan. Therefore,
TMPA contends, Bryan's complaint does not fall within the purview of the Commission's
jurisdiction under chapter 35. Because TMPA raises this assertion, we must determine then, solely
for purposes of the jurisdictional question, whether Bryan is a wholesale transmission customer of
TMPA.

 Under PURA, transmission service "includes construction or enlargement of facilities,
transmission over distribution facilities, control area services, scheduling resources, regulation
services, reactive power support, voltage control, provision of operating reserves, and any other
associated electrical service the commission determines appropriate." (11) Commission regulations
illumine this definition, explaining that transmission service "allows a transmission service customer
to use the transmission and distribution facilities of electric utilities, electric cooperatives and
municipally owned utilities to efficiently and economically utilize generation resources to reliably
serve its loads and to deliver power to another transmission service customer." 16 Tex. Admin.
Code § 25.5(141) (West 2003). A transmission service customer is a "transmission service provider,
distribution service provider, river authority, municipally-owned utility, . . . or other person whom
the commission has determined to be eligible to be a transmission service customer." Id. § 25.5(142)
(West 2003). TMPA does not dispute that Bryan is its customer, but rather disputes that Bryan is
its transmission service customer.

 TMPA asserts that it is its own transmission service customer because the power sales
contract requires it to bear all responsibility for delivering power to Bryan at the point of delivery. 
However, in the 1997 rate-setting proceeding, which required a utility to apply for transmission
service if it were a transmission customer, 21 Tex. Reg. 3343, 3353 (1996), repealed 24 Tex. Reg.
2873 (1999) (former Commission rule 23.70(e)), TMPA declared to the Commission that


 TMPA is not a transmission customer, either in actuality or pursuant to the
Commission's rules. . . . TMPA is not a transmission customer because TMPA is not
receiving transmission service. TMPA has no load responsibility. The electricity
generated by TMPA is purchased by its customers, who bear all load responsibility
for TMPA's generation. TMPA requests the Commission to revise the matrices
attached to the proposed order to delete the designation of TMPA as a "transmission
customer."



(Emphasis added.) In the final order, the Commission left TMPA's load responsibility blank and
listed the member cities as nominating their own loads. Similarly in the 1998 rate-setting
proceeding, the Commission listed TMPA as bearing no load responsibility and the member cities
as nominating their own loads.

 In Bryan's complaint proceeding, the Commission cited a portion of TMPA's
representation that it was not a transmission service customer and determined that Bryan was
authorized to nominate its own load. In the 1999 rate-setting proceeding, the Commission concluded
that "the fact that the Cities sought and obtained unbundled transmission services for 1997 and 1998
indicates that the contractual arrangement does not preclude Bryan from obtaining unbundled
services." Based on TMPA's representations in the earlier proceedings that it was not a transmission
customer because its member cities nominated their own loads--upon which the Commission was
entitled to rely in the later proceedings--we disagree with TMPA's assertion that the member cities
are not wholesale transmission service customers. We thus conclude, for the purposes of
determining jurisdiction, that Bryan is a wholesale transmission service customer of TMPA.

 TMPA next asserts that the Commission lacked the authority to determine that Bryan
is entitled to nominate its own load because the dispute solely pertains to the rates prescribed by the
power sales contract. Accordingly, TMPA argues, the Commission's orders allowing Bryan to take
unbundled service were impermissible reformations of the contract between TMPA and Bryan. (12) 
TMPA further asserts that the Commission's orders constitute rate setting, which the supreme court
invalidated in the San Antonio case. All parties agree that the Commission does not have the
authority to adjudicate contract disputes. The point of disagreement is whether the Commission's
orders constitute an adjudication of a contract dispute. As those issues are pending in a separate suit,
we are not being asked to decide any contractual issues between TMPA and Bryan.

 We thus turn to TMPA's assertion that the Commission engaged in rate setting when
it determined that Bryan could nominate its own load. In its complaint, Bryan alleged that TMPA
had violated chapter 35 by granting a rate preference to the Northern Cities, engaging in
discriminatory pricing, impermissibly shifting transmission costs from one customer to another
customer, and setting rates that were higher than the rates set by the 1997 and 1998 proceedings. 
Thus, Bryan asked the Commission to examine wholesale transmission charges that the TMPA board
of directors had already set. Under the limits of chapter 35 set forth in San Antonio, Bryan's
complaint and subsequent request to nominate its own load in the 1999 rate-setting proceeding fell
within the Commission's jurisdiction. Under chapter 35, the Commission has "the specific power
to review rates for reasonableness." San Antonio, 53 S.W.3d at 319. The chapter additionally
confers on the Commission the express power "to ensure that all utilities provide nondiscriminatory
access to transmission service." Id. "Once confronted with a dispute between utilities," as occurred
here, under chapter 35 "the Commission can arrive at a reasonable rate to resolve that dispute." Id.
at 320. That was precisely the Commission's role in examining Bryan's complaint and, in the 1999
rate-setting proceeding, in reviewing Bryan's request to nominate its own load. Moreover, even had
Bryan not filed a complaint, "to ensure that utilities are providing comparable prices and services
and non-discriminatory access, and to protect a utility's customers from bearing others' transmission
costs, the Commission has the independent ability to order utilities to appear before it even without
a dispute." Id. (emphasis added).

 TMPA additionally contends that chapter 40 of PURA limits the Commission's
jurisdiction by giving municipally owned utilities the ability to compete in the newly deregulated
market. See generally PURA §§ 40.001-.104 (West Supp. 2004). The parties agree that chapter 40,
which became effective on September 1, 1999, has no application to Bryan's complaint proceeding
and applies to the 1999 rate-setting proceeding only for the last four months of 1999. TMPA
specifically points to section 40.055(a)(2), which states that a municipally owned utility has
"exclusive jurisdiction" to "determine whether to unbundle any energy-related activities and, if the
municipally owned utility chooses to unbundle, whether to do so structurally or functionally." Id.
§ 40.055(a)(2). Section 40.055(a)(2) is one of ten subsections in section a, the last of which reads,
"make any other decisions affecting the municipally owned utility's participation in customer choice
that are not inconsistent with this chapter." Id. § 40.055(a)(10) (emphasis added). Section 40.055
is part of a subchapter entitled "Municipally Owned Utility Choice," id. §§ 40.051-.060, which
pertains to a municipally owned utility's discretion to participate in "customer choice." Id.
§ 40.051(a). Under this scheme, "customer choice" refers to "the freedom of a retail customer to
purchase electric services." Id. § 31.002(4) (West Supp. 2004). Thus, a municipally owned utility's
jurisdiction under section 40.055 pertains to retail competition. Furthermore, section 40.055(a)(1)
excludes from a municipally owned utility's "exclusive jurisdiction" "wholesale transmission rates,
terms of access, and conditions for wholesale transmission service set by the commission under this
subtitle." Id. § 40.055(a)(1).

 TMPA further points to section 40.101 as a limit on the Commission's jurisdiction. 
This provision states: "This subtitle may not interfere with or abrogate the rights or obligations of
parties, including a retail or wholesale customer, to a contract with a municipally owned utility . . . ." 
Id. § 40.101. We reiterate that the Commission does not have the authority to adjudicate contract
disputes. Nevertheless, section 40.101 does not override the Commission's jurisdiction under
chapter 35. The opening provision to chapter 40, section 40.001, states that "[w]ith respect to the
regulation of municipally owned utilities, this chapter controls over any other provision of this title,
except for sections in which the term 'municipally owned utility' is specifically used." Id. § 40.001. 
In subchapter A of chapter 35, which is in the same title as chapter 40, the term "'electric utility'
includes a municipally owned utility." Id. § 35.001. Thus, the Commission's express authority to
"ensure that an electric utility . . . provides nondiscriminatory access to wholesale transmission
service," id. § 35.004(b) (emphasis added) and "require an electric utility to provide transmission
service at wholesale to another electric utility . . . [and] determine whether the terms for the
transmission service are reasonable," id. § 35.005(a) (emphasis added), specifically includes
authority over municipally owned utilities.

 Furthermore, section 40.004, entitled "Jurisdiction of Commission," affirms the
Commission's jurisdiction to regulate wholesale transmission rates: "Except as specifically
otherwise provided in this chapter, the commission has jurisdiction over municipally owned utilities
only for the following purposes: (1) to regulate wholesale transmission rates and service, including
terms of access, to the extent provided by Subchapter A, Chapter 35." Id. § 40.004. Contrary to
TMPA's assertions, chapter 40 confirms the Commission's oversight jurisdiction under chapter 35.

 In conclusion, we do not find that the district court erred in granting Bryan's motion
for partial summary judgment that "as a matter of law, chapter 35 of PURA conferred jurisdiction
on the Commission to determine whether the terms on which TMPA provided transmission services
to Bryan were reasonable." Accordingly, the district court further did not err in denying TMPA's
motion for partial summary judgment as to the Commission's jurisdiction.

 TMPA contends nevertheless that the Commission lacked jurisdiction to hear Bryan's
complaint because the Commission's wholesale transmission rate matrix was based on rules that San
Antonio has since invalidated. We disagree. The invalidation of the rules in 2001 does not figure
into whether Bryan's complaint fell within the Commission's chapter 35 jurisdiction. Additionally,
it was appropriate for the district court to remand these proceedings to the Commission in light of
the San Antonio case and the 1999 amendments to PURA. The Commission should have the
opportunity to reconsider its orders on remand. We may not make substantive decisions committed
by statute to the Commission. Public Util. Comm'n v. GTE-SW, 833 S.W.2d 153, 175 (Tex.
App.--Austin 1992), aff'd in part, rev'd in part on other grounds, 901 S.W.2d 401 (Tex. 1995). 
"[T]he terms of the final order are matters committed to agency discretion as long as the agency
corrects the assignment of errors sustained on appeal." Id. Were we to render judgment, we would
usurp the Commission's authority to revisit the issues in light of the San Antonio holding and the
1999 amendments to PURA.


TMPA's Request for Declaratory Relief

 Having found that chapter 35 of PURA conferred jurisdiction on the Commission to
determine whether the terms on which TMPA provided transmission services to Bryan were
reasonable, we hold that TMPA's request for declaratory relief is unnecessary and redundant. (13) 
Accordingly, we overrule all of TMPA's issues, affirming the district court's grant of summary
judgment in favor of Bryan, denial of TMPA's motions for partial summary judgment, and dismissal
of TMPA's request for declaratory relief. We affirm the judgments of the district court.


CONCLUSION


 The sole issue before us is whether chapter 35 of PURA conferred jurisdiction on the
Commission to determine whether the terms on which TMPA allocated wholesale costs for
transmission of electricity to Bryan were reasonable. Although TMPA disputes that Bryan is its
wholesale transmission customer, for purposes of determining jurisdiction, we conclude that Bryan
is a wholesale transmission customer of TMPA.

 In its complaint, Bryan asked the Commission to examine the allocation of rates by
the TMPA board of directors and asserted that the board's actions violated several provisions of
chapter 35. This chapter grants the Commission "the specific power to review rates for
reasonableness." San Antonio, 53 S.W.3d at 319. The chapter additionally gives the Commission
the express power "to ensure that all utilities provide nondiscriminatory access to transmission
service." Id. "Once confronted with a dispute between utilities," as occurred here, under chapter
35 "the Commission can arrive at a reasonable rate to resolve that dispute." Id. at 320. Because
Bryan's complaint and subsequent request to nominate its own load in the 1999 rate-setting
proceeding falls within the Commission's jurisdiction under chapter 35, we uphold the district
court's grant of partial summary judgment in favor of Bryan that "as a matter of law, chapter 35 of
PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA
provided transmission services to Bryan were reasonable." Furthermore, because our determination
of the jurisdictional issue renders redundant TMPA's request for a declaration that the Commission
lacked jurisdiction, we affirm the district court's dismissal of its request for declaratory relief. We
affirm the judgments of the district court.



 

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear


Affirmed


Filed: May 20, 2004

1. These causes of action originally included a contract dispute between TMPA and Bryan,
which the district court severed. The contract dispute was transferred to and is pending in Grimes
County, the site of TMPA's Gibbons Creek plant, which generates electricity for all of TMPA's
member cities.
2. Act of June 16, 1995, 74th Leg., R.S., ch. 765, § 2.08, 1995 Tex. Gen. Laws 3972, 4000
(amended 1997) (current version at Tex. Util. Code Ann. § 35.006(a) (West 1998)).
3. Texas utilities have voluntarily interconnected their regional transmission networks to form
a single grid maintained by the Electric Reliability Council of Texas ("ERCOT"). When power
within the ERCOT region is sold in a wholesale transaction, it is transported over this power grid. 
See Public Util. Comm'n v. City Pub. Serv. Bd., 109 S.W.3d 130, 131 (Tex. App.--Austin 2003, no
pet.).
4. Act of June 16, 1995, 74th Leg., R.S., ch. 765, §§ 2.07-.08, 1995 Tex. Gen. Laws 3972,
3999-4000, amended by Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, secs. 35.001-.008, 1997
Tex. Gen. Laws 713, 766-67 (codified at PURA §§ 35.001-.008). The Legislature again amended
PURA in 1999. Citations in this discussion are to the pre-1999 version of the act unless otherwise
noted.
5. Id. § 2.01, 1995 Tex. Gen. Laws 3972, 3988 (current version at PURA § 11.002(a) (West
Supp. 2004)).
6. PURA § 35.004(b).
7. Id. § 35.004(c).
8. Id. § 35.005(a).
9. Id. § 35.006(a).
10. Id. § 35.008.
11. Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, sec. 31.002(7), 1997 Tex. Gen. Laws
713, 745 (amended 1999) (current version at PURA § 31.002(20) (West Supp. 2004)).
12. Although TMPA quoted portions of the power sales contract in its pleadings in Bryan's
complaint proceeding, TMPA never introduced the contract into evidence.
13. On rehearing, TMPA suggests for the first time on appeal in the alternative that we
"cannot" decide its request for declaratory relief until after the contract issues are heard in the Grimes
County case. The sole purpose of a motion for rehearing is to provide the court an opportunity to
correct any errors on issues already presented. Wentworth v. Meyer, 839 S.W.2d 766, 778 (Tex.
1992) (Cornyn, J., dissenting). A motion for rehearing does not afford a party an opportunity to raise
new issues "after the case has been briefed, argued, and decided on other grounds," id., unless the
error is fundamental. Keightley v. Republic Ins. Co., 946 S.W.2d 124, 126 n.1 (Tex. App.--Austin
1997, no pet.) (op. on reh'g). Fundamental error exists "in those rare instances in which the record
shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that
interest is declared in the statutes or the Constitution of Texas." Pirtle v. Gregory, 629 S.W.2d 919,
920 (Tex. 1982). Because TMPA does not raise an issue of fundamental error, we decline to address
this point.