TEXAS MUNICIPAL POWER AGEN-
CY, City of Denton, City of Garland,
and Geus f/k/a Greenville Electric
Utility System, Petitioners,

v.

PUBLIC UTILITY COMMISSION OF
TEXAS and City of Bryan,
Texas, Respondents

Texas Municipal Power Agency, City of
Denton, Texas, City of Garland, Texas,
and City of Greenville, Texas, Peti-
tioners,

v.

Public Utility Commission of Texas
and City of Bryan, Texas,
Respondents.

Nos. 04–0751, 04–0752.

Supreme Court of Texas.

Argued Oct. 18, 2005.

Delivered Dec. 14, 2007.

Rehearing Denied June 20, 2008.

R. Lambeth Townsend, Lloyd Gosselink Blevins Rochelle & Townsend, P.C., Lawrence S. Smith, Smith Majcher & Mudge, L.L.P., William B. Wagner, W. Wendell Hall, James R. Bailey, Fulbright & Jaworski L.L.P., Austin, TX, for Petitioner.

Elizabeth R.B. Sterling, Douglas Fraser, Greg Abbott, Edward D. Burbach, Karen Watson Kornell, Office of the Attorney General, Brook Bennett Brown, D.L. (Lin) Hughes, Marc O. Knisely, McGinnis Lochridge & Kilgore, L.L.P., Austin, TX, for Respondent.

Jo Campbell, Waco TX, for Amicus Curiae.

Justice GREEN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, Justice MEDINA, and Justice JOHNSON joined.

In this statutory construction case we are asked to decide whether the Public Utility Commission of Texas has jurisdiction to revise a uniform sales rate, which includes charges for wholesale transmission service, set by contract between a municipally owned utility (MOU) and its member cities. We hold that chapter 35 of the Public Utility Regulatory Act (PURA) does not give the Commission express or implied authority to do so. To the extent that the court of appeals held otherwise, we reverse the court of appeals' judgment and render judgment in favor of the MOU. We remand the declaratory judgment claims to the court of appeals for further consideration.

## I. BACKGROUND

The wholesale electric power industry consists of the generation of electrical power, the transmission of electricity over power lines, and the distribution of power to customers. See Pub. Util. Comm'n v. City Pub. Serv. Bd., 53 S.W.3d 310, 312 (Tex.2001) [hereinafter San Antonio ]. To enhance reliability and facilitate the purchase of electrical power among utilities, Texas's electric utilities formed the Electric Reliability Council of Texas (ERCOT), an interconnected network of transmission lines that serves most of the state. Id. Some electric utilities belonging to ERCOT are owned and operated by the municipalities that they serve.

Texas Municipal Power Agency (TMPA)[1] is an MOU that sells electric power at wholesale to its member cities, Denton, Garland, and Greenville, Texas, (collectively, the Northern Cities) and Bryan, Texas, pursuant to identical power sales contracts (collectively, the PSC).[2] The PSC, entered into in 1976, requires TMPA to generate electric power at its

---

1. TMPA is a municipal power agency created under chapter 163, subchapter C of the Texas Utilities Code.

2. The member cities provide retail electric service and, thus, each is an MOU.

generating plant in Grimes County, Texas, and transmit power to the member cities at their respective points of delivery. TMPA incorporates its costs, including power generation and delivery costs, into the single power sales rate that it charges each of the member cities. Each member city then pays for the amount of power that it used under the power sales rate applicable to all member cities. The PSC is a "bundled" contract, meaning that the power seller (TMPA) provides generation, transmission, and distribution of power under one contract. *See Transmission Access Policy Study Group v. Fed. Energy Regulatory Comm'n,* 225 F.3d 667, 690 (D.C.Cir.2000), *aff'd sub nom. New York v. Fed. Energy Regulatory Comm'n,* 535 U.S. 1, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002). Likewise, the sales rate charged under the PSC is a "bundled" rate because it does not include separate rates or charges for transmission service. Because the contract and rate are bundled, member cities are never charged a separate price for transmission power; they have discretion only regarding the amount of power they take and the point of delivery.

Historically, ERCOT MOUs were not subject to regulation by the Commission. *See San Antonio,* 53 S.W.3d at 312, 316–18. In 1995, however, the Legislature authorized the Commission to regulate wholesale transmission service by electrical utilities, including MOUs, when it enacted chapter 35 of PURA to promote competition in the wholesale electricity market. Act of March 29, 1995, 74th Leg., R. S., ch. 9, § 1, 1995 Tex. Gen. Laws 31 (amended 1997, 1999) (current version at Tex. Util.Code §§ 35.001–.008). The 1995 PURA amendments granted utilities "open access" to transmission lines, allowing utilities to purchase power from remote sellers without obtaining transaction agree-

ments for the use of transmission lines. *See id.* Under later PURA amendments, MOUs were given the ability to choose when and how they would participate in the newly competitive, deregulated electricity market. Act of May 27, 1999, 76th Leg., R. S., ch. 405, 1999 Tex. Gen. Laws 2543. If an MOU chooses to participate, a decision that is irreversible, the retail customers in that municipality may select their power provider. *Id.*

After enactment of chapter 35 and under its new authority over MOUs, the Commission adopted transmission service rules, including a wholesale transmission pricing methodology to establish transmission charges for all ERCOT utilities. 21 Tex. Reg. 1397 (1996) (adopting former 16 Tex. Admin. Code § 23.67); 21 Tex. Reg. 3343 (1996) (adopting former 16 Tex. Admin. Code § 23.70); *see San Antonio,* 53 S.W.3d at 312, 316–17 (invalidating portions of the Commission rule setting rates for transmission services). The Commission's pricing scheme for transmission service, which resulted in lower rates than one of the member cities was required to pay under the PSC's bundled rate, led to the underlying dispute in this case.

In 1997, the Commission engaged in its first proceeding to set rates that each ERCOT utility would pay and receive for wholesale transmission service. The Commission transmission charges were based in part on the distance power traveled from a generating plant to the point of delivery. As part of a "transition mechanism," TMPA filed a pleading with the Commission claiming that, for purposes of the new pricing scheme, TMPA was not a transmission customer and could thus recover its full costs and escape paying to subsidize other utilities.[3] TMPA and the

---

3. TMPA's filing asserted that it "is not a trans-

mission customer, either in actuality or pur-

member cities reportedly agreed that the cities should be the wholesale transmission customers that nominate their own loads for the transmission service of TMPA-generated electricity to their cities.[4] As a result, the Commission assigned wholesale transmission charges to each member city. Because the PSC provides that TMPA will include in its sales rate all costs associated with delivery of TMPA-generated power to the member cities, the TMPA board of directors[5] in July 1997 voted to reimburse the member cities for the Commission-imposed transmission charges.[6]

In June 2001, we invalidated the Commission's pricing methodology rules. *San Antonio*, 53 S.W.3d at 318–21. We held in *San Antonio* that the Commission's pricing scheme exceeded its chapter 35 authority because, although the Commission has an oversight role regarding transmission regulation of MOUs, it lacks authority to set rates for MOUs. *Id.* As a result of the *San Antonio* decision and a settlement among all ERCOT utilities, the 201st dis-

trict court in Travis County reversed the Commission's 1997 rate-setting order in 2003.[7]

The Commission engaged in a second rate-setting proceeding in 1998. As in the 1997 rate-setting proceeding, TMPA and the member cities listed the individual cities as transmission customers. Again, pursuant to our *San Antonio* decision and the related ERCOT settlement, the 98th district court in Travis County reversed the Commission's 1998 rate-setting order.[8]

This appeal arises from two proceedings, both challenging the scope of authority PURA gives the Commission over MOUs.[9] Before we ruled the Commission's pricing methodology for MOUs invalid, Bryan initiated a complaint proceeding before the Commission ("the Bryan Complaint Proceeding"), alleging that TMPA's inclusion of the Commission-imposed transmission charges in its uniform rate violated chapter 35 of PURA, the Commission's 1997 rate-setting order, and the Commission's

---

suant to the Commission's rules." TMPA based its position on the fact that it "has no load responsibility" and that "[t]he electricity generated by TMPA is purchased by its customers, who bear all load responsibility for TMPA's generation." In its final order, the Commission left TMPA's load responsibility blank and listed the member cities as nominating their own loads. This Court later invalidated the Commission's entire rate-setting scheme, including former section 23.67(g)(8) of the Texas Administrative Code relating to the "transition mechanism," though that subsidy and transition mechanism was not specifically addressed. *See San Antonio*, 53 S.W.3d at 318–21.

**4.** The Commission's 1996 transmission rules, which were later invalidated and repealed, provided that a transmission customer shall declare which generators would produce specific amounts of electricity it planned to take to meet its demand. PUC Subst. R. 23.70(*o*)(4), *adopted by* 21 Tex. Reg. 3343 (1996), *repealed by* 24 Tex. Reg. 2873 (1999).

**5.** The TMPA board of directors consists of two directors from each member city.

**6.** Bryan reportedly refused to accept those reimbursements at times.

**7.** The district court remanded the matter to the Commission to consider the settlement, which remains pending at the Commission.

**8.** The district court in that case likewise remanded the matter to the Commission to consider the settlement, which remains pending at the Commission.

**9.** Two related appeals have been filed in this Court. In case 04–0751, TMPA and the Northern Cities seek judicial review of the Commission's final order in its 1999 rate-making proceeding. In case 04–0752, TMPA and the Northern Cities seek judicial review of the Commission's final order in a proceeding initiated by Bryan to challenge TMPA's authority to charge the PSC bundled transmission rate. We address the cases together in this opinion.

pricing rules. The bundled sales rate Bryan paid TMPA under the PSC was higher than what it would owe if it were able to pay the Commission-set transmission charges and any remaining sales charges separately.[10] As a result, Bryan contended that TMPA reallocated the Northern Cities' more expensive transmission costs to Bryan. Bryan took the position that, because the 1997 rate-setting proceeding recognized that each member city could nominate its own load for power supplied by TMPA, the member cities were able to treat their contracts as "unbundled" because TMPA charged separately for generation, transmission, and distribution. On July 8, 1999, the Commission issued a final order agreeing that Bryan could nominate its own load and therefore was not obligated to pay the full bundled contract sales rate to TMPA but could instead pay TMPA only the transmission charges set by the Commission.

TMPA and the Northern Cities sought judicial review of the Commission's order issued in the Bryan Complaint Proceeding, and TMPA later added a declaratory judgment claim regarding the Commission's jurisdiction and ability to unbundle the PSC, affecting the PSC terms and rates.[11] The 200th district court in Travis County granted a partial motion for summary judgment in Bryan's favor, holding that, as a matter of law, PURA chapter 35 conferred jurisdiction on the Commission to determine whether the terms under which TMPA provided transmission services to Bryan were reasonable. The district court reversed the Commission's final order and

remanded the contested case proceedings to the Commission for reconsideration in light of the *San Antonio* decision. In addition, the district court granted pleas to the jurisdiction filed by Bryan and the Commission and dismissed TMPA's declaratory judgment claims. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 100 S.W.3d 510, 519–20 (Tex.App.-Austin 2003, pet. denied) (reversing the trial court's pleas to the jurisdiction and remanding the case to the trial court for consideration of TMPA's declaratory judgment claims).

Soon after Bryan filed its complaint with the Commission, TMPA filed suit in Grimes County alleging that, by refusing to pay the full sales price charged by TMPA, Bryan had breached the PSC. TMPA sought declarations of the parties' rights and obligations under the PSC. Bryan filed counterclaims alleging TMPA's breach of the PSC and seeking similar declaratory relief.[12]

In 1999, the Legislature enacted amendments to PURA, including new statutory provisions in chapter 40 governing MOUs. Act May 27, 1999, 76th Leg., R. S., ch. 405, 1999 Tex. Gen. Laws 2543. The changes related primarily to the regulation of privately-owned electric utilities, effectively requiring those utilities to unbundle their services and deregulating generation and retail sales functions, while transmission and distribution functions remained regulated by the Commission as a utility service. *Id.* The changes that became chapter 40 of PURA gave MOUs the right to

---

**10.** The difference appears to result from two factors: (1) the Commission-set rates varied in proportion to the distance the power traveled, and (2) Bryan was closer to the TMPA's generating plant than any of the Northern Cities.

**11.** The contract claims, including those "relating to the construction, interpretation, ap-

plication, validity, or enforceability" of the PSC were transferred to a suit that remains pending in Grimes County.

**12.** That case, which now includes contract claims raised in the Bryan Complaint Proceeding and transferred by the Travis County district court, remains pending.

decide whether and how to participate in the deregulation and unbundling process. *Id.*

The second proceeding giving rise to this appeal began before the 1999 PURA amendments became effective, when the Commission engaged in its rate-setting proceeding to establish wholesale transmission rates.[13] TMPA argued that, under the PSC, it was the transmission customer and could nominate the load for delivery of electricity from TMPA's generating plant. Citing TMPA's contrary filings in the 1997 and 1998 rate-making proceedings, Bryan argued that it was the transmission customer. Based on TMPA's statements in the 1997 rate-making case, the Commission assumed Bryan could be treated as the transmission customer without violating the PSC. The Commission concluded that Bryan was "entitled to unbundled transmission service." [14]

TMPA and the Northern Cities sought judicial review of the 1999 rate-setting order, and TMPA sought a declaratory judgment.[15] As in the suit seeking review of the Commission's Bryan Complaint Proceeding order, TMPA sought declarations regarding the Commission's jurisdiction and authority to unbundle and affect the terms of the PSC between TMPA and Bryan and the contract sales rate, and declarations regarding the parties' obli-

gations under the PSC. The 200th district court in Travis County heard the cases together and issued rulings that were essentially the same as those in the Bryan Complaint Proceeding. As with the appeals of the 1997 and 1998 rate-setting orders, the district court reversed the Commission's order and remanded the rate-setting proceedings to the Commission, granted partial summary judgment in favor of Bryan, denied TMPA's motion for summary judgment, and dismissed TMPA's declaratory judgment claims.

The Third Court of Appeals reviewed together the district court's rulings from the Bryan Complaint Proceeding and the 1999 rate-setting proceeding. *Texas Municipal Power Agency v. Public Utility Com'n of Texas*, 150 S.W.3d 579, 584 (Tex. App.-Austin 2004). On appeal from the Bryan Complaint Proceeding, TMPA and the Northern Cities challenged the partial summary judgment and the district court's dismissal of the declaratory judgment claims. *Id.* The Northern Cities did not seek review of the district court's reversal of the Commission's order. *Id.* On appeal from the 1999 rate-setting proceeding, TMPA and the Northern Cities did not contest the reversal of the Commission's rate-setting order, but challenged the district court's rulings regarding the Commis-

13. The Commission has conducted rate-setting proceedings for the years 2000 through 2004. In each of those annual transmission rate orders, the Commission held that Bryan was not required to pay TMPA's uniform sales rate. Each year, TMPA appealed the Commission's final order. Those jurisdictional claims remain pending in the district court. We presume that the Commission has conducted additional rate-setting proceedings since 2004, but the briefing in this case does not address any such proceedings.

14. The Commission specifically held that Bryan could "nominate the resources that will be used to serve its loads." The Commis-

sion concluded that "the fact that the Cities sought and obtained unbundled transmission services for 1997 and 1998 indicates that the contractual arrangement does not preclude Bryan from obtaining unbundled services." However, the Commission decided that the Northern Cities could list TMPA as their agent for transmission service of the electricity they purchased from TMPA.

15. Brazos Electric Cooperative, Inc. and the City of San Antonio also filed suits for judicial review of issues not raised in this case. Brazos Electric Coop reportedly later dismissed its appeal after reaching a settlement.

sion's jurisdiction. *Id.* The court of appeals concluded that chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable. *Id.* at 592. Therefore, the court affirmed the district court's grant of summary judgment in favor of Bryan and the district court's denial of TMPA's motions for partial summary judgment, and affirmed the TC's dismissal of TMPA's request for declaratory relief. *Id.*

## II. PURA CHAPTER 35

■ We must determine the scope and nature of the Commission's jurisdiction over an MOU's bundled sales contract and bundled sales rate.[16] TMPA and the Northern Cities ask us to decide whether PURA grants the Commission jurisdiction to modify, regulate, or abrogate the PSC and the uniform sales rate that TMPA charges Bryan under the PSC. TMPA and the Northern Cities argue that the court of appeals' decision radically expands the Commission's authority over MOUs, changes the parties' contractual rate and obligations under the PSC, and effectively transforms the PSC into an unbundled contract. The Commission argues that the issue is not whether it has authority to

unbundle a sales contract between MOUs but whether it has jurisdiction over wholesale transmission service, including oversight authority to ensure that transmission rates are reasonable. We hold that the Commission's actions to revise the rate Bryan was required to pay for transmission service effectively unbundled the PSC and exceeded the authority granted in chapter 35 of PURA.

The Commission refuses to characterize the issue in this case as one relating to its power to unbundle a contract and instead focuses on whether an MOU may contract away the Commission's oversight of wholesale transmission service.[17] But the consequence of the Commission's action in the underlying cases was the unbundling of the longstanding PSC that Bryan and TMPA agreed to more than thirty years ago. Though the dissent believes "TMPA need not unbundle its services structurally or functionally to comply with the Commission's order," we disagree. *See* 253 S.W.3d at 203. In the Bryan Complaint Proceeding, the Commission modified the PSC by dictating that Bryan was only obligated to pay new Commission-set transmission charges and no longer had to pay the PSC's uniform sales rate. In the 1999 rate-setting proceeding, the Commission specifically ruled that Bryan, which no

---

16. Bryan suggests that the PSC is not a bundled contract because the term "bundled" appears nowhere in the contract and the contract contains no similar phrase. In the final order in the Bryan Complaint Proceeding, the Commission found that "[u]nder the PSCs, TMPA charges each Member City a bundled rate, which includes the cost of generating and delivering electricity to the points of delivery." The PSC provides that TMPA will charge and the member cities will pay a single sales rate for generation and transmission of electricity to the cities' points of delivery. We agree with the Commission that the PSC contract is bundled.

17. The Commission has not always taken this position and has previously claimed to have the authority to unbundle contracts. In adopting transmission service rules, the Commission stated that it "has the ability to conduct proceedings to reform contracts as necessary on a case-by-case basis." 21 Tex. Reg. 1397, 1399 (1996). And in its summary judgment briefing in the district court, the Commission stated that it "has the implied authority under ... PURA provisions to require unbundling." Moreover, in the final order from the 1997 rate-setting proceeding, the Commission stated that a customer having a bundled sales contract can choose to abrogate that contract and begin taking unbundled transmission service.

longer wanted to receive bundled service, was entitled to take unbundled transmission service for 1999.[18] By separating out transmission charges and modifying the rate parties to the PSC must pay, the Commission unbundled the PSC.[19] Today we decide whether the Commission has jurisdiction to modify the rate a party to a bundled sales contract must pay for transmission service and, consequently, whether the Commission can unbundle a sales contract between MOUs.

TMPA and the Northern Cities challenge the district court's grant of Bryan's motion for partial summary judgment and the denial of their own motion for partial summary judgment. We review the trial court's decision to grant summary judgment de novo. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994). Although the denial of summary judgment is normally not appealable, we may review such a denial when both parties moved for summary judgment and the trial court granted one and denied the other. *See Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex.1996). We review the summary judgment evidence presented by each party, determine all questions presented, and render judgment as the trial court should have rendered. *Comm'rs Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). The district court granted Bryan's motion for partial summary judgment on the sole ground that "as a matter of law, PURA Ch. 35 conferred jurisdiction on the [Commission] to determine whether the terms on which TMPA provided transmission service were reasonable." Statutory construction is a question of law, which we review de novo. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002). In ascertaining the scope of an agency's authority, we give great weight to the agency's own construction of a statute. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex.1994).

All parties agree that any jurisdictional authority for the Commission's action in these cases would be found only in PURA chapter 35. We therefore consider the limited question of whether PURA chapter 35 confers jurisdiction on the Commission to modify the terms of transmission service as provided by the longstanding PSC.

A state agency's powers are limited to (1) powers expressly conferred by the Legislature, and (2) "implied powers that are reasonably necessary to carry out the express responsibilities given to it by the

---

18. The dissent argues that nothing in the Commission's order prohibits TMPA from charging a single bundled rate that's ten times the Commission's transmission rates for Bryan and five times the rate for other member cities. 253 S.W.3d at 203. But the Commission's order in the 1999 rate-setting proceeding specifically concludes that "[t]he City of Bryan is entitled to take unbundled transmission service," although TMPA may offer bundled service to customers wanting that service. Under the Commission's orders, therefore, it appears that TMPA could only charge the bundled uniform rate to customers who want bundled service and must offer separate, unbundled rates for Bryan.

19. The dissent claims that, at most, the Commission's orders require it to separate out its bills, but not unbundle its services. 253 S.W.3d at 203. But separating out costs and rates for generation, transmission, and distribution operations is itself a functional unbundling. *See* PUC Subst. R. 23.67(*o*) (amended and recodified at PUC Subst. R. 25.191–.204); *Transmission Access Policy Group v. Fed. Energy Regulatory Comm'n*, 225 F.3d 667, 690 (D.C.Cir.2000), *aff'd sub nom. New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (describing the term "bundled" as using utility facilities "to generate, transmit, and distribute electricity to their customers" and explaining that "[t]raditionally, the customer paid one combined rate for both the power and its delivery, thus the industry refers to such sales as 'bundled.' ").

Legislature." *San Antonio*, 53 S.W.3d at 315. Chapter 35 contains no express authority granting the Commission jurisdiction over an MOU's existing sales contracts.[20] Because chapter 35 is silent as to the Commission's jurisdiction to revise a PSC, we must determine whether any implied powers give the Commission such jurisdiction. We explained in *San Antonio*:

[W]hen the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. An agency may not, however, exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes.

*Id.* at 316 (citations omitted). For us to conclude that the Commission acted within its authority, we must determine that the agency's power to regulate power sales contracts is "reasonably necessary" to carry out an express duty or function assigned to the Commission under chapter 35.

Chapter 35 expressly imposes five mandatory duties on the Commission: (1) ensuring that an electric utility provides non-discriminatory access to its transmission facilities; (2) ensuring that a utility recovers its reasonable costs in providing transmission services from the entity receiving the service; (3) pricing wholesale transmission services using postage stamp methodology; [21] (4) ensuring that ancillary services are available at reasonable prices and on terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive; and (5) adopting rules relating to transmission service, rates, and access. TEX. UTIL. CODE § 35.004(b)-(e), § 35.006(a). In addition, chapter 35 expressly provides that the Commission may: (1) require an electric utility to provide transmission service at wholesale, and may determine whether the terms of that service are reasonable; and (2) require parties to a dispute concerning prices or terms of wholesale transmission service to engage in nonbinding alternative dispute resolution. *Id.* § 35.006(a), § 35.008. Accordingly, we must determine whether the power to amend an MOU's bundled sales contract and sales rate is reasonably necessary to carry out any of those duties.

The court of appeals and the Commission focus primarily on the Commission's power to determine whether the terms of wholesale transmission service are reasonable. *See id.* § 35.005(a) ("The commission may require an electric utility to provide transmission service at whole-

---

20. We note, however, that the Legislature has provided, in another context, express authority to abrogate or modify an agreement that sets a price or rate. The Legislature's delegation of authority to the Texas Railroad Commission provides that the agency "may review, revise, and regulate an order or agreement that is made by the person or corporation and establishes a price, rate, rule, regulation, or condition of service." TEX. UTIL.CODE § 121.153. We must presume that the Legislature's exclusion of such language in PURA chapter 35 was purposeful. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981).

21. Under the postage stamp method of setting rates, "a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region." TEX. UTIL.CODE § 35.004(d). TMPA uses postage stamp methodology to set a single, uniform sales rate that each member city must pay regardless of the transmission distance.

sale to another electric utility ... and may determine whether terms for the transmission service are reasonable."). TMPA argues that the Commission can exercise this power without affecting any existing power sales contracts. We agree. When a wholesale electricity customer needs to move electricity from the generating plant to the point of sale, the Commission has the power to ensure open access to transmission lines and may require the utility that owns the lines to provide transmission service. In that case, the Commission has power to oversee the terms of transmission service provided, including the authority to determine whether the transmission rates charged are reasonable. We recognized this limited authority to review rates in *San Antonio*, 53 S.W.3d at 320–21. If the Commission believes the transmission utility's rates may be unreasonable, the Commission may order the utilities to appear and, if necessary, may set a reasonable rate. *Id.* at 320. Though "chapter 35 envisions largely an oversight role for the Commission with respect to wholesale transmission transactions," we explained in *San Antonio* the circumstances under which the agency may exercise that oversight capacity:

> The statute contemplates that one utility will request transmission service from another utility. Should those parties not be able to agree on the terms for service, they can turn to the Commission. *In that circumstance,* the Commission can order one utility to provide service to another, can determine whether the terms for that service are reasonable, and can ensure that the utility providing service recovers its costs from the utility receiving service. Once confronted with a dispute between utilities, the Commission can arrive at a reasonable rate to resolve that dispute. The Commission also has the option to refer parties to alternative dispute resolution

to settle disputes over transmission service pricing. Moreover, to ensure that utilities are providing comparable prices and services and non-discriminatory access, and to protect a utility's customers from bearing others' transmission costs, the Commission has the independent ability to order utilities to appear before it even without a dispute.

*Id.* (citations omitted) (emphasis added). We refuse to take that last sentence out of context, which is limited to Commission-ordered provision of service, as the Commission and the dissent would have us do. The statute allows the Commission to assess reasonableness of transmission service, but the language of the statute limits that oversight to Commission-ordered service. TEX. UTIL.CODE § 35.005(a) (titled "Authority to Order Transmission Service," providing that "[t]he commission may require an electric utility to provide transmission service at wholesale to another electric utility ... and may determine whether terms for the transmission service are reasonable"). Nowhere does PURA chapter 35 give the Commission general rate oversight capacity, which it claims to have. When, as here, the Commission need not order transmission service because the generating utility provides that service pursuant to a contractual agreement under which the parties have operated for many years, PURA grants the Commission no power to review reasonableness of rates.

The dissent argues that chapter 35 is not limited to new requests for transmission and that changed conditions may transform an existing contract and thus create Commission jurisdiction to review the contractual rate. 253 S.W.3d at 201–02. We did not decide this question in our 2001 *San Antonio* decision, as the dissent believes. In 2001, we held that chapter 35 does not grant the Commission authority

to set wholesale transmission rates by rule. *San Antonio*, 53 S.W.3d at 320. Though we did state in *San Antonio* that the Commission may set a reasonable rate to resolve a dispute between utilities, as we discussed in that case, the Commission's authority to do so is limited to the circumstances provided by the Legislature, open access disputes and Commission-ordered transmission service.[22] *See* TEX. UTIL.CODE § 35.005(a); *San Antonio*, 53 S.W.3d at 320. The dissent characterizes this case as a dispute between utilities regarding whether one is being overcharged for transmission, but whether the utility is overpaying for transmission service turns on the question before us, whether chapter 35 of PURA authorizes the Commission to modify or abrogate an existing sales contract. We are not convinced that the power to revise the uniform sales rates set pursuant to the bundled PSC is reasonably necessary to carry out the limited statutory authority the Legislature granted the Commission to ensure reasonable terms of wholesale transmission service.[23]

Likewise, we believe the Commission can ensure open, non-discriminatory access to transmission service without impacting an MOU's existing sales contract. Because the Commission has express authority to require that access to a transmission system be provided, the power to alter a PSC is not reasonably necessary to facilitate open access to transmission facilities. Similarly, because ERCOT transmitting utilities have made filings since 1997 demonstrating their costs of providing transmission services, we see no reason why the Commission would need to alter a PSC or sales rate to ensure that utilities recover their transmission service costs. Based on the transmission utilities' costs, the Commission can establish pricing using a postage stamp methodology, even for utilities that have bundled sales contracts. Setting a postage stamp rate would require the agency to know the ERCOT utilities' combined costs of providing transmission service, which should have no impact on MOUs' bundled sales contracts. And based on the utilities' costs to provide ancillary services, or services necessary to facilitate the transmission of electricity, the Commission can ensure that those ancillary services are provided at reasonable prices and on reasonable terms and conditions. Nothing about an MOU's sales contract should affect the Commission's duty to adopt rules relating to transmission service, rates, and access. Moreover, as we already addressed, while the Commission has the ability to hear open access disputes

**22.** Relying on part of section 35.005(a) of PURA, the dissent claims that chapter 35 authorizes the Commission to determine whether the terms of transmission service by or for MOUs are reasonable. 253 S.W.3d at 202–03. The dissent omits the critical first part of section 35.005(a), however, and thus misrepresents the Commission's authority. Section 35.005(a), titled "Authority to Order Transmission Service," provides in full:

The commission may require an electric utility to provide transmission service at wholesale to another electric utility, a qualifying utility, an exempt wholesale generator, or a power marketer and may determine whether terms for the transmission service are reasonable.

**23.** Bryan has not addressed the subject of implied powers. Bryan focuses on statements made by TMPA in the 1997 and 1998 rate-setting proceedings and argues that TMPA is barred from enforcing the contract as written. TMPA's conduct in identifying the "transmission customer," Bryan argues, effectively unbundled the PSC. However, the district court transferred all claims pertaining to the validity, interpretation, and enforceability of the PSC to the pending case in Grimes County. The question of whether the PSC was amended by the parties' conduct was not before the lower courts in the underlying proceedings, is not before us in this case, and can be decided in the Grimes County contract suit.

that arise when one utility requests transmission service from another and the parties cannot agree on the terms, an MOU's existing sales contract should have no bearing on such hearings. *See San Antonio,* 53 S.W.3d at 320. While the Commission may require parties involved in transmission disputes to submit to alternative dispute resolution, exercising such power should not impact power sales contracts between MOUs. We conclude that the Commission should reasonably be able to carry out its statutory duties without affecting sales contracts and contractual sales rates between MOUs. Because the power to modify or abrogate sales contracts and sales rates is not reasonably necessary for the Commission to carry out its express statutory duties, we conclude that the Legislature has not impliedly given the Commission such power.

■ The Commission claims that it has jurisdiction in the 1999 rate-setting case to decide whether Bryan is the transmission customer for the electricity it purchased from TMPA. According to the Commission, chapter 35 impliedly gives it authority to make such a determination. TMPA and the Northern Cities acknowledge the Commission's power to identify the wholesale transmission customer and determine who is obligated to make transmission payments. But that power, they argue, does not give the Commission the authority to determine matters of contract. Those matters are left to the courts. *See Amarillo Oil v. Energy–Agri Prods.,* 794 S.W.2d 20, 26–28 (Tex.1990) (indicating that the Railroad Commission can determine for regulatory purposes who has the right to drill a well, but leaving the question of who owns the gas to the courts); *Bolton v. Coats,* 533 S.W.2d 914, 917 (Tex.1975) (indicating that the Railroad Commission's classification of a well for regulatory purposes did not preclude the plaintiff from

pursuing a breach of contract claim based on drainage of oil from the leasehold). We agree that the Commission can generally decide who is the transmission customer responsible for payment under its regulatory scheme, but any question regarding the enforceability of the contractual sales rate must be left to the courts. And in this case, where the identity of the "transmission customer" and the question of whether TMPA's 1997 and 1998 filings amended the PSC and relieved Bryan of its obligations to pay the uniform, bundled sales rate are one in the same, we are not convinced that chapter 35 allows the Commission to make a decision that results in the unbundling of a PSC.

■ The Commission argues that, under PURA, its statutory power to regulate wholesale transmission service is not defeated by the existence of a contract between MOUs. Because chapter 35 makes no exception for transmission service pursuant to contracts, the Commission believes the Legislature intended for the Commission to regulate all wholesale transmission service, including service under contracts. TMPA and the Northern Cities argue that the Legislature's silence regarding contracts indicates that the Legislature did not intend for the Commission to have jurisdiction to modify the terms of a sales contract. The Legislature clearly can provide express authority for an agency to abrogate or modify a rate-setting agreement between parties, and it did just that when it delegated authority to the Texas Railroad Commission to "review, revise, and regulate an order or agreement that is made by the person or corporation and establishes a price, rate, rule, regulation, or condition of service." TEX. UTIL. CODE § 121.153. We presume that the Legislature's exclusion of such language in PURA chapter 35 was purposeful. *See Cameron v. Terrell & Garrett, Inc.,* 618

S.W.2d 535, 540 (Tex.1981). Taking into account subsequent legislative action in PURA chapter 40, which we address below, we cannot accept the Commission's interpretation of legislative intent.

█ Finally, the Commission and Bryan argue that the State's police power to regulate industries such as electric utilities that are affected with a public interest prevails over private contract rights. *See Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 634–35 (Tex.1996) (recognizing that an exercise of the police power necessary to safeguard the public safety and welfare can justify impairment of contractual rights and obligations); *see also Midland Realty Co. v. Kansas City Power & Light Co.*, 300 U.S. 109, 113, 57 S.Ct. 345, 81 L.Ed. 540 (1937) ("But the State has power to annul and supersede [utility] rates previously established by contract between utilities and their customers."). Relying on TMPA's enabling statute, in which "this state reserves its power to regulate [a municipal power] agency's rates and charges for electric energy supplied by the agency's facilities," TEX. UTIL.CODE § 163.063(b), the Commission and Bryan contend that TMPA entered into the PSC subject to the State's regulatory authority. TMPA and the Northern Cities do not dispute that general notion but point out that, unlike the cases relied upon by the Commission and Bryan, the Commission failed to show a delegation to the agency of the State's power to modify contracts. *Cf. Tex. Water Comm'n v. City of Fort Worth*, 875 S.W.2d 332, 334 (Tex.App.-Austin 1994, writ denied) ("[T]he statute expressly authorizes the Commission to review any decision of a provider that affects the amount a recipient public utility pays for

service."). In its briefing, Bryan agrees that any of TMPA's private contractual rights "must yield to the state's exercise of its police powers over wholesale transmission services *as delegated to the Commission in PURA Chapter 35.*" Having concluded that chapter 35 of PURA does not expressly or impliedly delegate to the Commission authority to regulate or revise power sales contracts or the uniform rates set pursuant to such contracts, we must conclude that the State's police power does not impair private contract rights in this case.

### III. PURA CHAPTER 40

█ In 1999, the Legislature enacted legislation to deregulate the electric power markets in Texas. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543. Chapter 39 of PURA codified specific guidelines for how investor-owned utilities (IOUs) are to unbundle their services and provide open access to distribution systems to ensure retail competition and customer choice. TEX. UTIL.CODE §§ 39.051, 39.203. Chapter 40 clarifies the role of MOUs in the newly deregulated market. Unlike IOUs, the Legislature did not require MOUs to unbundle services and expressly provided that the decision of whether to unbundle rests exclusively with the MOU. *See id.* §§ 40.055(a)(2), 40.054(e). Chapter 40 became effective on September 1, 1999, after the Commission issued its final order in the Bryan Complaint Proceeding and while the 1999 rate-setting proceeding was pending before the Commission.[24] *See* Act of May 27, 1999, 76th Leg., R. S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2558, 2602. TMPA and the Northern Cities rely on PURA chapter 40, which expressly prohibits the Commis-

---

**24.** As discussed above, on appeal to the district court, the final orders in the Bryan Complaint Proceeding and the 1999 rate-setting

proceeding were reversed in their entirety and remanded to the Commission.

sion from interfering with or abrogating an MOU's power sales contract, even when exercising chapter 35 authority. The Commission acknowledges that chapter 40 prohibits the very conduct it claims is authorized under chapter 35, but it contends applying chapter 40 to this case would be an improper retroactive application of a statute. *See* TEX. CONST. art. I, § 16. The court of appeals stated: "The parties agree that chapter 40 ... has no application to Bryan's complaint proceeding and applies to the 1999 rate-setting proceeding only for the last four months of 1999." 150 S.W.3d at 590. TMPA and the Northern Cities dispute that statement and contend that chapter 40 applies to the entire period at issue. TMPA and the Northern Cities therefore ask us to decide whether PURA chapter 40 applies to TMPA's declaratory judgment claims and to the administrative proceedings remanded to the Commission.

TMPA and the Northern Cities argue that we must harmonize chapters 35 and 40, but the Commission challenges our ability to consider chapter 40. We have held that the prohibition against retroactive application of laws does not apply to procedural, remedial, or jurisdictional statutes because such statutes typically do not affect a vested right. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex.2002). Those statutes should be applied as they exist at the time judgment is rendered, even if the laws did not exist when the original order was issued. *Bradley v. Sch. Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Subaru*, 84 S.W.3d at 219–20; *Holder v. Wood*, 714 S.W.2d 318, 319 (Tex.1986). Because the statutory provisions relied upon by TMPA and the Northern Cities are jurisdictional, as explained below, we conclude that chapter 40 applies to the ongoing proceedings and to the declaratory judgment actions regarding the Commission's jurisdiction. And we see no reason that we should not

look to the current statute to help ascertain the limits of the Commission's jurisdiction.

According to TMPA and the Northern Cities, provisions in PURA chapter 40 demonstrate that the Legislature intended to leave the decision of whether and how an MOU participates in retail competition to the MOU's discretion. Section 40.054 states: "The Commission *does not have jurisdiction* to require unbundling of services or functions of ... a municipally owned utility...." TEX. UTIL.CODE § 40.054(e) (emphasis added). Section 40.055, entitled "Jurisdiction of Municipal Governing Body," similarly states that the MOU itself has the sole authority to unbundle: "The municipal governing body or a body vested with the power to manage and operate a municipally owned utility *has exclusive jurisdiction* to ... determine whether to unbundle any energy-related activities and, if the municipally owned utility chooses to unbundle, whether to do so structurally or functionally." *Id.* § 40.055(a)(2) (emphasis added). Section 40.101, entitled "Interference with Contract," states that subtitle B of PURA (chapters 31 through 41) "may not interfere with or abrogate the rights or obligations of the parties, including a retail or wholesale customer, to a contract with a municipally owned utility or river authority." *Id.* § 40.101(a). Giving effect to the plain language of the statute, we must conclude that the Legislature never intended to give the Commission authority to interfere with an MOU's contract rights or rate. *See Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 860 (Tex. 2005) ("Straightforward statutory construction ensures that ordinary citizens are able 'to rely on the plain language of a statute to mean what it says.'" (citation omitted)). Rather, the Legislature seems to have left to the courts the authority to

determine what rights parties to those contracts may have.[25]

■ The Commission and Bryan argue that chapter 35 overrides chapter 40 so that chapter 40 does not apply when chapter 35 is involved. The court of appeals agreed based on the second sentence of section 40.001, which states: "With respect to the regulation of municipally owned utilities, this chapter controls over any other provision of this title, except for sections in which the term 'municipally owned utility' is specifically used." 150 S.W.3d at 590. We disagree. PURA chapter 35 uses the phrase "municipally owned utility," so the provision contained in section 40.001(a), stating that chapter 40 would control, does not apply. Because chapter 35 does not give the Commission authority to amend, modify, or abrogate an MOU's contract, there is no conflict between the provisions of chapter 35 and the provisions of section 40. We cannot conclude that the provisions of section 40.101, which protect interference with or abrogation of contracts between an MOU and its retail or wholesale customers, do not apply when operating under chapter 35. See Tex. Gov't Code § 311.021 (providing that we should not interpret one portion of a statute so as to render another portion of the statute meaningless). To the contrary, we believe that the limitations on the Commission's jurisdiction expressed in section 40.101 apply to the regulation of MOUs under chapter 35.

We hold that the Commission does not have jurisdiction under PURA to modify, regulate, or abrogate the PSC between TMPA and the member cities and the bundled sales rate for wholesale electric power under the PSC. Accordingly, we reverse the court of appeals' judgment to the extent that the judgment sustained the granting of Bryan's motion for summary judgment and the denial of TMPA's motion for summary judgment. We render judgment in favor of TMPA and the Northern Cities.

## IV. DECLARATORY JUDGMENT CLAIMS

TMPA sought declarations regarding the Commission's jurisdiction to abrogate, amend, or regulate the PSC and the bundled sales rate under the PSC. TMPA now asks us to decide whether the court of appeals erred in affirming the district court's dismissal of those claims. The court of appeals' opinion states: "Having found that chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable, we hold that TMPA's request for declaratory relief is unnecessary and redundant." 150 S.W.3d at 591.

The Commission and Bryan contend that the court of appeals never reached or decided the jurisdictional question and that the only issue before this Court is whether the court of appeals erred in affirming the trial court's dismissal of the declaratory judgment claims, not the merits of those claims. TMPA, however, suggests that the court of appeals believed it had already resolved its jurisdictional claims adversely to TMPA and urges us to decide the merits of those claims, which have been fully briefed and argued. See Little v. Tex. Dep't of Crim. Justice, 148 S.W.3d 374, 384 (Tex.2004) (suggesting that we may have discretion to consider issues briefed but not decided by the court of appeals).

---

**25.** The Commission suggests that chapter 40 was not a jurisdictional amendment to PURA, but the plain statutory language clearly shows that the provisions of chapter 40 are jurisdictional.

Having fully addressed the Commission's jurisdiction in response to the first two issues presented by TMPA and the Northern Cities, we agree with the court of appeals that the declaratory judgment claims appear to be redundant. *See Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex.1970) ("An action for declaratory judgment will not be entertained if there is pending, at the time it is filed, another action or proceeding between the same parties and in which may be adjudicated the issues involved in the declaratory judgment action."); *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex.1990) ("The Declaratory Judgments Act is 'not available to settle disputes already pending before a court.'" (citations omitted)). In a related appeal, however, the Third Court of Appeals ruled that the trial court has subject matter jurisdiction over the declaratory judgment claims, that the claims are not barred by sovereign immunity, and that the claims are not duplicative of the suit for judicial review of Commission orders. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 100 S.W.3d 510, 519–20 (Tex.App.-Austin 2003, pet. denied). Referring to a suit for judicial review of Commission orders as an Administrative Procedure Act (APA) appeal, that court stated:

> An APA appeal allows a district court to rule on a *particular Commission order*, but the [declaratory judgment] action brought in this case asks for a determination of the *Commission's general authority* to adjudicate the underlying dispute.... While an APA appeal may be resolved on the ground that the agency involved has exceeded its statutory authority or violated the constitution, *see* Tex. Gov't Code Ann. § 2001.174(2)(A), (B) (West 2000), the district court's determination in that case only considers the validity of the specific order being appealed. The question posed to the

court by [TMPA's declaratory judgment] action is broader than the effectiveness of one particular order and requests relief more expansive than the reversal of a particular Commission determination. The narrow appellate procedure provided by the APA to attack a particular Commission order, on any of the available grounds, does not displace the district court's ability to determine the scope of an agency's authority through a properly brought [declaratory judgment] action, as we encounter in this case.

*Id.* Because we cannot determine from the court of appeals' opinion whether it considered the merits of the declaratory judgment claims, which the court previously characterized as distinct from and not duplicative of the claims for judicial review of Commission orders, we reverse the court of appeals' judgment sustaining dismissal of TMPA's claims for declaratory relief and remand those claims to the court of appeals for further consideration. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996) (remanding a case to the court of appeals when we did not have the benefit of the court of appeals' full decision on the merits).

The Commission and Bryan state that TMPA has another forum for obtaining declaratory judgment relief and assert that dismissal of those claims was proper because the same claims can still be addressed in the suit pending in Grimes County. TMPA believes this Court is the proper forum for resolution of the jurisdictional claims because the two cases before this Court were filed before the Grimes County suit and judicial economy dictates that the process not start fresh in that court. In addition, TMPA expresses concern that Bryan and the Commission may seek to use the court of appeals' decision to argue that the Grimes County district court should dismiss the pending declara-

tory judgment claims. Having remanded the declaratory judgment claims to the court of appeals, we leave these issues for that court to consider.

## V. CONCLUSION

We hold that PURA does not give the Commission express or implied power to regulate, modify, or abrogate the PSC between TMPA and its member cities or the bundled uniform sales rate charged to MOUs under that contract. Accordingly, we reverse the court of appeals' judgment sustaining the trial court's rulings on motions for summary judgment, and we render judgment in favor of TMPA and the Northern Cities that the Commission lacked jurisdiction to unbundle or interfere with the PSC and lacked jurisdiction to modify the uniform sales rate for wholesale electric power under the PSC. We reverse the court of appeals' judgment sustaining dismissal of declaratory judgment claims filed by TMPA, and we remand those claims to the court of appeals for further consideration.

Justice BRISTER filed a dissenting opinion, in which Justice WILLETT joined.

Justice BRISTER, joined by JUSTICE WILLETT, dissenting.

The Public Utility Commission "has jurisdiction over municipally owned utilities ... to regulate wholesale transmission rates."[1] Yet the Court holds it cannot regulate those rates when the parties have a private contract, even if that contract itself recognizes that it is subject to governmental rates and regulations.[2] Requiring the Commission to act but denying it the power to act is, as James Madison wrote more than two centuries ago, contrary to both law and reason:

> No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included.[3]

Because the Legislature has ordered the Commission to set these rates but the Court holds it cannot, I respectfully dissent.

We answered the precise question here in our 2001 opinion *Public Utility Commission of Texas v. City Public Service Board of San Antonio.*[4] There, we held the Commission could not set transmission rates by rule, but "[o]nce confronted with a dispute between utilities, the Commission can arrive at a reasonable rate to resolve that dispute."[5] This was just such a case, confronting the Commission with a dispute between utilities about whether one was being overcharged for transmission.

The Court decides the Commission did not have jurisdiction here (despite what we said in 2001) because Chapter 35 of the Texas Utilities Code applies only when the Commission orders new transmission service after a provider has refused it. Nothing in Chapter 35 says so. To the contrary, section 35.004 requires the Com-

---

1.  TEX. UTIL.CODE § 40.004(1).

2.  The parties' contract provided:
    **Section 28: Governmental Rates, Regulations and Laws.** The Contract shall be subject to all valid rules, regulations and laws applicable thereto, as promulgated by the United States of America, the State of Texas, or any other governmental body or agency having lawful jurisdiction or any

    authorized representative or agency of any of them.

3.  THE FEDERALIST No. 44, at 74 (James Madison) (J. and A. M'Lean ed. 1788).

4.  53 S.W.3d 310 (Tex.2001).

5.  *Id.* at 320.

mission to ensure that transmission rates are reasonable and nondiscriminatory, whether the Commission has ordered service or not.[6] Yet the Court holds the Commission can do no such thing.

Here, the Commission ordered only two things, both of which fall well within the powers the Legislature has granted to it. First, the Commission authorized Bryan "to nominate its own load"—that is, to report to the Commission its anticipated demand for transmission of electricity. Chapter 35 specifically authorizes the Commission to "adopt rules relating to wholesale transmission service, rates, and access," [7] one example of which (as we said in 2001) is the power to order utilities "to make filings with the Commission." [8] As such reports are part and parcel of the Commission's administrative process and absolutely necessary for it to fulfill several statutory duties,[9] it is up to the Commission to decide who should make them. "When an administrative agency is created to centralize expertise in a certain regulatory area, it is to be given a large degree of latitude in the methods it uses to accomplish its regulatory function." [10] More-

over, this order can have no effect on the parties' contract; TMPA acknowledges in its brief that allowing Bryan to nominate its own load (as it did in 1997) neither amended nor modified their contract. Plainly, this administrative designation is one in which the courts have little interest and less expertise.

Second, the Commission's order changed TMPA's transmission charges alone—not its charges for generation, administration, or all charges when added together. The Court incorrectly says the Commission ordered more, requiring TMPA to reduce (1) transmission charges, *and* (2) the parties' contractual uniform sales rate.[11] The first is fact, the second is fiction. The Commission's last legal conclusion was that "Bryan is obligated to pay only those transmission charges established by the Commission." There was no legal conclusion setting aside the parties' total sales price, which is why the Court does not quote one.

Chapter 35 authorizes the Commission to oversee transmission service by or for municipal utilities like TMPA and Bryan, and to determine whether the terms of

---

6. *See* Tex. Util.Code § 35.004(b) ("The commission shall ensure that an electric utility or transmission and distribution utility provides nondiscriminatory access to wholesale transmission service ....."); *id.* § 35.004(c) ("When an electric utility ... provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs ... so that the utility's other customers do not bear the costs of the service.").

7. *Id.* § 35.006(a).

8. *San Antonio,* 53 S.W.3d at 319 (citing 16 Tex. Admin. Code § 23.67(*o*)).

9. *See, e.g.,* Tex. Util.Code § 35.004(d) ("The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which

a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region."); *id.* § 35.007(a) ("Except as provided by Subsection (b), an electric utility that owns or operates a transmission facility shall file a tariff in compliance with commission rules adopted under Section 35.006."); *id.* § 40.004(7) (granting Commission jurisdiction "to require reports of municipally owned utility operations only to the extent necessary to: (A) enable the commission to determine the aggregate load and energy requirements of the state and the resources available to serve that load").

10. *State v. Pub. Util. Comm'n of Tex.,* 883 S.W.2d 190, 197 (Tex.1994).

11. —— S.W.3d at ——.

that service are reasonable.[12] One of the most important of those terms, of course, is price. Here, the Commission found that Bryan's transmission rates were unreasonable because they were the same rates as its sister cities, who were much farther from the generating plant. The statute clearly makes transmission rates the Commission's business, not ours.

TMPA says this order effectively requires it to unbundle its services. But at most, the Commission's orders require it to unbundle its bills, not its business. TMPA knows perfectly well what the transmission charges are for each city, as electricity for Bryan is transmitted over its own lines, and electricity for the remaining cities is transmitted over TXU lines at Commission established rates. As TMPA reports in its own brief, since 1997 "transmitting utilities have made filings showing these costs without having to unbundle any existing sales contract." While the Commission's order in the Complaint Proceeding limited TMPA's transmission charges, it did not require TMPA to separate generation and transmission services or even bill them separately.

The order in the Rate Proceeding three months later arguably went further by stating that "Bryan is entitled to nominate its own load and take unbundled transmission service." But the parties' contract was never admitted in that proceeding or mentioned in the order, and the decision was based on the result in the earlier Complaint Proceeding which did *not* require separate services. The only issue in the Rate Proceeding was who should nominate the load, and the Commission promises that it intended to adjudicate nothing more when it ordered transmission service "unbundled." Based on this judicial admission,[13] this Court has no basis to presume otherwise. Thus, TMPA need not unbundle its services structurally or functionally to comply with the Commission's order—it can simply charge each city the rates that already appear in its own books.

Seizing on this ambiguity about unbundling, TMPA argues the Commission has abrogated the parties' contract. But while the Commission ordered that *transmission* rates had to be lower for Bryan than its sister cities, it never said anything about the *total* rate TMPA could charge. To the contrary, the Commission expressly denied exercising any authority over TMPA's power generation rates or the parties' contract. Thus, for example, if the Commission's transmission rate for Bryan was 5¢/kwh and for the other cities 10¢/kwh, nothing in the order here said TMPA could no longer charge each city a bundled price of 50¢/kwh—offsetting Bryan's lower transmission rates with higher generation rates. Whether doing so would violate the parties' power contracts is a question pending in the Grimes County litigation, and thus is not before us. All the Commission said here (and the sole ground for the trial court's summary judgment against TMPA) was that the Commission had jurisdiction to determine TMPA's transmission rates.

Accordingly, we need not decide today whether chapter 40 (effective September 1, 1999) applies retroactively. Even if it

---

12. Tex. Util.Code § 35.005(a) ("The commission may require an electric utility to provide transmission service at wholesale to another electric utility ... and may determine whether terms for the transmission service are reasonable."); *id.* § 35.001 ("In this subchapter, 'electric utility' includes a municipally owned utility....").

13. *See Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 568 (Tex.2001) ("A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact.").

does, it still allows the Commission to regulate TMPA's transmission rates,[14] which is all the Commission purports to do. While it expressly prohibits the Commission from ordering municipally owned utilities to unbundle services, for the reasons noted above that is not what the Commission's orders require.[15]

This dispute concerns electricity rates charged ten years ago. Those rates have yet to be recalculated based on our 2001 decision in *San Antonio*. After eight years, the parties' contract litigation in Grimes County has yet to begin in earnest, pending the outcome of this administrative appeal. And as the contract at issue here expires in 2011, the parties' litigation will probably last longer than their relationship. Meanwhile, the rest of the world has moved on, the Legislature having abrogated the result we reached in *San Antonio* two years before we wrote it.[16]

All this serves as a reminder why courts should think long and hard before getting involved in administrative rate-setting proceedings. In my view, it is past time to let the Commission get about its business. I would affirm the judgments of the courts below and remand these proceedings to the Commission.

**14.** Tex. Util.Code § 40.004(1) ("Except as specifically otherwise provided in this chapter, the commission has jurisdiction over municipally owned utilities only for the following purposes: (1) to regulate wholesale transmission rates and service, including terms of access, to the extent provided by Subchapter A, Chapter 35....").

**15.** *Id.* § 40.054(e); *see also id.* § 40.055(a)(2) (vesting exclusive jurisdiction regarding unbundling to body vested with the power to manage and operate a municipally owned utility).

**16.** *See Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 327 (Tex.2001) (Hecht, J., dissenting) ("What can be said with absolute certainty, however, is that the Legislature determined in 1999 that the Commission's postage stamp rate was consistent with the overall scheme of chapter 35 and the best way to achieve its purposes. In light of that determination, I do not understand how it is possible to conclude, as the Court does, that the exact same statute in 1995, minus the provision added in 1999, prohibited the Commission's postage stamp rate methodology.").