

## IN THE
## TENTH COURT OF APPEALS

_____

### No. 10-17-00316-CV

_____

**CORSICANA INDUSTRIAL FOUNDATION, INC.,
GANDER MOUNTAIN COMPANY AND
JP MORGAN CHASE BANK, N.A.,**

           **Appellants**

 **v.**

**CITY OF CORSICANA AND NAVARRO COUNTY,**

           **Appellees**

_____

### From the 13th District Court
### Navarro County, Texas
### Trial Court No. D17-26224-CV

_____

### OPINION

_____

In this declaratory judgment action, we must determine the constitutionality of certain Agreements between governmental entities, the City of Corsicana and Navarro County, Appellees, and private entities, Corsicana Industrial Foundation, Inc., and Gander Mountain Company, Appellants. Additionally, Appellant JP Morgan Chase Bank, N.A. is a third-party beneficiary of the Agreements. We refer to the Appellants

collectively as "Chase." Chase complains of the partial summary judgment rendered in favor of Appellees that resulted in termination of the Agreements. We affirm.

## Background

Corsicana Industrial Foundation, Inc., owner of 132 acres, sought to develop a retail center on its land. In 2004, to help facilitate that project, the Foundation entered into separate Retail Center Development Agreements (RCDAs) with the City of Corsicana and Navarro County. The City and County each passed a resolution, signed respectively by the mayor of the City and the Navarro County judge and county commissioners, to enter into the RCDA and incorporated the RCDA into the resolution. The City and County agreed to grant to the Foundation certain sales tax revenues generated by Gander Mountain, Home Depot, and the other businesses that would be located in the development. The Foundation agreed to use all proceeds solely for the purpose of repayment of debt associated with the construction of a Gander Mountain facility.

Three months after signing the RCDAs, the City, County, Foundation, and Gander Mountain entered into an "Interlocal Agreement." The Interlocal Agreement provided that the City and County determined it is in the public interest to promote the economic development of the Gander Mountain facility and to grant portions of the city and county sales tax to facilitate such economic development.

The Interlocal Agreement specified the amounts of sales taxes to be pledged to the Foundation as security for the loan it was to obtain to construct the Gander Mountain facility. The tax revenue was to be deposited into the Foundation's Sales Tax Fund and applied to the payment of the loan. The yet-to-be-determined lender, now Chase, was named as a third-party beneficiary of the Interlocal Agreement. The Foundation leased the Gander Mountain site to Gander Mountain by a lease dated May 6, 2004. Further, those two parties entered into a Development Agreement pursuant to which the Foundation was obligated to obtain a construction loan to finance construction of the Gander Mountain store. The $10,000,000 loan ultimately obtained by the Foundation in 2005 was secured in part by a pledge of certain portions of the sales taxes granted to the Foundation.

The Gander Mountain store opened for business in August 2004 and closed in 2015. In early 2016, the City and County determined that closing of the Gander Mountain store extinguished the constitutionally permissible public purposes for which they can dedicate public funds. They each passed a resolution to seek relief from the Foundation and Gander Mountain. Pursuant to those resolutions, they filed this declaratory action against Gander Mountain and the Foundation seeking declarations regarding the following five matters:

1. Whether the closing of the Gander Mountain store in Corsicana extinguished the public purposes which authorized the City's and County's grants of public money.

2. Whether the Interlocal Agreement and Retail Center Development Agreements, and the other transaction documents including the Lease and Development Agreement, fail to place sufficient controls on the transaction to ensure that the public purposes for which the original grant was made are carried out.

3. Whether the Retail Center Development Agreements and Interlocal Agreement are unconstitutional, void and/or illegal because they allow public funds to be spent without the necessary controls in place to ensure the public purposes are carried out.

4. Whether it would be unconstitutional and/or illegal (and a void act) for the City and County to continue to grant sales tax to pay off the loan when public purposes are no longer being served and the Gander Mountain facility is no longer open.

5. Whether the Interlocal Agreement and Retail Center Development Agreements are unconstitutional, void and/or illegal to the extent they purport to require the City and County to grant sales tax revenues to pay off the loans when the public purposes are no longer being served.

The Foundation and Gander Mountain filed counterclaims against the City and the County, seeking declaratory relief regarding the City's and County's obligations. Also, the Foundation and Gander Mountain filed cross-claims against each other regarding the lease. Chase filed a plea in intervention seeking, in pertinent part, declaratory relief regarding the construction of the provisions of the constitution involved in this dispute. The City and County amended their petition, seeking declaratory judgment against Chase.

In February 2017, the City and the County filed their motion for partial summary judgment asserting they are entitled to summary judgment regarding their requests for declaratory relief. The following month, Gander Mountain filed a Chapter 11 petition for bankruptcy. The bankruptcy court modified the automatic stay, allowing the City and

County to proceed to final hearing on their pending motion for summary judgment. It further provided that, if the City and County prevail on the summary judgment motion, the trial court could take steps necessary to enter an appealable final judgment.[1] In July 2017, the trial court granted the motion for partial summary judgment, rendering a declaratory judgment in favor of the City and County. The following month, the trial court severed the City's and County's claims against the Foundation, Gander Mountain, and Chase, and the counterclaims against the City and County, from the remaining claims asserted by and between Gander Mountain, the Foundation, and Chase.[2] The City and County non-suited their claim for attorney's fees. The trial court signed a final judgment on November 7, 2017 rendering declaratory judgment in favor of the City and County and ordering that Gander Mountain, the Foundation, and Chase take nothing on their counterclaims against the City and the County.

Specifically, the trial court declared that the closing of the Gander Mountain store extinguished the public purposes which authorized the City's and County's grants of public money to repay loans taken out by the Foundation to build the Gander Mountain

---

[1] Thereafter, the City and County filed their second amended petition and first amended motion for summary judgment, to which Chase and Gander Mountain objected as violative of the bankruptcy court's order partially lifting the stay. The parties entered into a Rule 11 agreement providing that the City and County would withdraw their second amended petition and first amended motion for partial summary judgment. Accordingly, the City's and County's first amended original petition and initial motion for partial summary judgment are the live pleadings.

[2] The claims between Gander Mountain, the Foundation, and Chase are not part of this appeal.

store; the Agreements[3] failed to place sufficient controls on the transaction to ensure that the public purposes for which the original grants of sales tax were made were carried out; the Agreements are unconstitutional because they allow public funds to be spent without the necessary controls in place to ensure that the public purposes which authorized the grants are carried out; it would be unconstitutional for the City and County to continue to grant sales tax proceeds to repay the loan once the Gander Mountain facility was no longer open and no public purpose is being served; and the Agreements are unconstitutional to the extent they purport to require the City and County to grant sales tax proceeds to pay off the loan when the public purposes supporting the grants are no longer being served.

Gander Mountain, the Foundation, and Chase filed notices of appeal. Shortly thereafter, they filed a notice of bankruptcy stay, and this court issued an opinion suspending the appeal pursuant to Texas Rule of Appellate Procedure 8.2. *See* TEX. R. APP. P. 8.2.; *Corsicana Indus. Found. v. City of Corsicana*, No. 10-17-00316-CV, 2017 Tex. App. Lexis 11581 (Tex. App.—Waco Dec. 13, 2017, no pet.) (mem. op.). The Foundation and Chase filed an unopposed motion to reinstate on November 3, 2022 based on the bankruptcy court's order allowing this appeal to proceed. The bankruptcy court also ordered that Gander Mountain shall not participate in this appeal. By order of November

---

[3] Unless otherwise specified, the term "Agreements" refers to the RCDAs and Interlocal Agreement collectively.

8, 2022, this court reinstated this appeal. *See* TEX. R. APP. P. 8.3. Chase and the Foundation filed an unopposed motion to substitute parties explaining that, in connection with Gander Mountain's bankruptcy, the Foundation assigned all of its rights in this appeal and the underlying lawsuit to Chase. This court granted the motion. Accordingly, Chase now pursues this appeal both individually and as assignee of the Foundation.

## Declaratory Judgment

In its sole issue, Chase contends the trial court erred in granting partial summary judgment and rendering a final declaratory judgment in favor of Appellees. In four sub-issues, Chase focuses on determination of the applicable constitutional provision, the effect of the closing of Gander Mountain, whether the Agreements contain sufficient controls to protect taxpayers, and the applicability of a statute requiring the Agreements to be presumed valid.

STANDARD OF REVIEW

In reviewing a declaratory judgment, we refer to the procedure for resolution of the issue at trial to determine the applicable standard of review on appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.010; *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 370 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Thus, declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. *Cadle Co. v. Bray*, 264 S.W.3d 205, 210 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Once the movant establishes a right to summary judgment as a matter of law, the burden shifts to the nonmovant to present any evidence raising a genuine issue of material fact, thereby precluding summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979). Review of a summary judgment requires that the evidence be viewed in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Fielding*, 289 S.W.3d at 848. We indulge every reasonable inference in favor of the non-movant and resolve any doubts in his favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

APPLICABLE LAW

The Texas constitution provides that the Legislature has no power to authorize any county, city, town, or other political corporation or subdivision of the State to lend credit or grant public money or thing of value in aid of, or to any individual, association, or corporation whatsoever. TEX. CONST. art. III, § 52(a). The Texas Supreme Court has explained that provision means that the Legislature cannot require gratuitous payments

to individuals, associations, or corporations. *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). A political subdivision's paying public money is not gratuitous if the political subdivision receives return consideration. *Id*.

Additionally, article III, Section 52-a of the constitution authorizes the legislature to provide for the creation of programs and the making of loans and grants of public money for the public purposes of development and diversification of the economy of the state, the elimination of unemployment or underemployment, or the development or expansion of commerce in the state. TEX. CONST. art. III, § 52-a. The Texas Local Government Code authorizes the governing body of a municipality and the commissioners court of a county to establish and administer programs for making loans and grants of public money to promote state or local economic development. TEX. LOC. GOV. CODE ANN. §§ 380.001, 381.004.

**Constitutionality of the Agreements**

Chase contends that the resolution of this case is governed by article III, Section 52-a of the Texas Constitution which creates an exception to the constitutional prohibition on the lending of public credit or granting of public money by providing that programs fostering economic growth serve a public purpose. Furthermore, the Texas legislature enacted statutes to encourage economic development through grants of public money, including Local Government Code Sections 380.001 and 381.004. To facilitate the

development of a new shopping center, Chase's argument continues, the City and County availed themselves of the economic development opportunities afforded by article III, Section 52-a and Sections 380.001 and 381.004.  It concludes that "[b]ecause the City and County properly pledged sales tax funds to repay the Foundation's loans under these constitutional and statutory provisions, the [Agreements] granting those funds for economic development are constitutional."

Appellees respond by arguing there is a three-part test for determining the constitutionality of the agreements.  They rely on a Texas Supreme Court case that considered whether the Texas Workers' Compensation Subsequent Injury Fund and the regulations implementing the fund violate Section 52(a) of the Texas Constitution.  *See Tex. Mun. League*, 74 S.W.3d at 384-86.  That section is a general prohibition of the use of public money for private purposes.  *See Byrd v. City of Dallas*, 6 S.W.2d 738, 740-41 (Tex. 1928).  Section 52(a) is intended to prevent the gratuitous grant of such funds to any individual, corporation, or purpose.  *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995).  Clarifying prior law, *Texas Municipal League* identified a three-part test to determine if a statute accomplishes a public purpose consistent with Section 52(a). The Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment;

and (3) ensure that the political subdivision receives a return benefit. *Tex. Mun. League*, 74 S.W.3d at 384.

In rebuttal, Chase argues that *Texas Municipal League* does not apply because it interpreted Section 52(a), which restricts the use of public money generally, not Section 52-a, which specifically allows use of public money for economic development. Chase asserts that Section 52-a is the only constitutional provision that applies here; but that if *Texas Municipal League* does apply, the three-prong test has been met.

Applicability of *Texas Municipal League*

The Texas Constitution contains several provisions limiting the use of governmental resources and powers for public purposes. *See* TEX. CONST. art. VIII, § 3 (taxes shall be levied and collected by general laws and for public purposes only); art. III, §§ 50, 51, 52(a) (prohibiting donation or loan or pledge of public moneys or credit to any person, association, or corporation); art. XI, § 3 (forbidding counties and cities from making donations or loans to private corporations); art. XVI, § 6(a), (b) (forbidding any appropriation for private or individual purposes unless authorized by the Texas Constitution and describing parameters of use of public money to aid handicapped persons). Other constitutional provisions provide for exemptions from taxation if public property is used for public purposes. *See id*. art. XI, § 9 (county or municipal property held for public purposes exempt from forced sale and taxation); art. VIII, § 2(a) (public property used for public purposes may be exempt from taxation).

It is for the courts to determine, as a matter of law, what a public purpose is. *Hous. Auth. v. Higginbotham*, 143 S.W.2d 79, 83 (Tex. 1940); *see also Davis v. City of Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934). However, where the legislature has declared a certain thing to be for a public use, such declaration of the legislature must be given weight by the courts. *Higginbotham*, 143 S.W.2d at 83. Generally, the objective of a "public purpose" is the promotion of the general prosperity and welfare of residents within a given political subdivision. *See Davis*, 67 S.W.2d at 1034. "[I]f an object is beneficial to the inhabitants and directly connected with the local government it will be considered a public purpose." *Id.* (quoting 6 EUGENE MCQUILLIN, MUNICIPAL CORPS. 292, § 2532 (2d ed. 1928)).

But establishing that the action at issue was implemented for a public purpose does not end the inquiry as to constitutionality. Long before the *Texas Municipal League* decision, when determining the constitutionality of any provision authorizing use of public funds committed in furtherance of some public purpose, courts have considered whether the governmental entity properly supervised and controlled the enterprise. *See Gillham v. City of Dallas*, 207 S.W.2d 978, 983 (Tex. Civ. App.—Dallas 1948, writ ref'd n.r.e.) (held that cold storage facilities serve a public market purpose so long as the city supervises and controls the buildings and business conducted therein). Additionally, in determining the constitutionality of an ordinance that provides for the grant of public money, courts have historically considered whether the governmental entity receives a return benefit. *See Byrd*, 6 S.W.2d at 740-41 (considering whether city's pension plan was

gratuitous and in violation of article III, Sections 51, 52; article VIII, Section 3; and article XVI, Section 6). Stated differently, courts require some form of continuing public control to ensure that the governmental entity receives its consideration, that is, accomplishment of the public purpose. *Key v. Comm'rs Court*, 727 S.W.2d 667, 669 (Tex. App.—Texarkana 1987, no pet.) (per curiam) (considering whether county violated article III, Section 52(a) when it transferred projects to a non-profit entity and failed to retain public control).

Article III, Section 52-a, the provision Chase relies on, is one of several constitutional provisions limiting the use of governmental resources for public purposes. Adopted in 1987, it specifically expanded the definition of public purposes to include economic development. *See* Tex. Att'y Gen. Op. No. JM-1255 at *13 (1990).[4] But there is nothing to suggest that Section 52-a was intended to relieve governmental entities from the obligation to prove the same factors required when determining the constitutionality of government actions involving other constitutional provisions. That is, government entities relying on Section 52-a are still required to show that public resources and powers are used for the direct accomplishment of a public purpose, transactions using such resources and powers contain sufficient controls to ensure the public purpose will be carried out, and the governmental entity receives a return benefit. *Id*. at *15-16; *see also* Tex. Att'y Gen. Op. No. KP-0261 at *5-7 (2019) (applying the *Texas Municipal League* test

---

[4] Even though Attorney General opinions are not controlling, they can be persuasive. *Holmes v. Morales*, 924 S.W.2d 920, 924 (Tex. 1996).

in construing Local Government Code Section 381.004(b) regarding a commissioner's court's authority to develop and administer economic development programs). We conclude that the determination of the constitutionality of provisions implemented for a public purpose calls for consideration of the same factors regardless of which constitutional provision may be implicated. In its *Texas Municipal League* opinion, the Texas Supreme Court merely restated prior law. *See Tex. Mun. League*, 74 S.W.3d at 384. Accordingly, we reject Chase's argument that the so-called *Texas Municipal League* three-prong test does not apply here.

Application of *Texas Municipal League*

*1) Accomplishment of a Public Purpose*

To meet the first requirement of the *Texas Municipal League* test, Appellees must ensure that the predominant purpose of the Agreements is to accomplish a public purpose. *See id*. Economic development has been declared a public purpose. TEX. CONST. art. III, § 52-a; *Higginbotham*, 143 S.W.2d at 83. Undoubtedly, Appellees intended a species of economic development. But the parties disagree as to the precise activity meant by that term. The trial court made no declaration identifying the public purposes that authorized the grant of sales tax proceeds. However, by its determination that the closing of the Gander Mountain store extinguished the public purposes, the trial court necessarily impliedly found as a matter of law that the operation of the Gander Mountain store in Corsicana was a public purpose. *See WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d

776, 783-87 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (examining declarations requested in motion for summary judgment to determine implied declarations made by the trial court when it granted motion).

Chase asserts that the public purpose of the tax grant was the development of a new shopping center, and when the shopping center was developed Appellees' objectives were met. Additionally, it contends, since the tax revenue was to be used for the exclusive purpose of paying the loan that financed the construction of the Gander Mountain facility, the public purpose of the tax incentives was tied to the construction of the building, not the continuous operation of Gander Mountain.

Appellees contend that the grant of tax money was meant to incentivize Gander Mountain's presence in Corsicana which would, in turn, spawn more economic development. Because the facility closed, they argue, Gander Mountain and the Foundation ceased fulfilling the public purposes for which they received sales taxes. In other words, they contend, and as declared by the trial court, the closing of the Gander Mountain store extinguished the public purposes which authorized Appellees' grants of public money. Instead, they assert, the result is the ongoing grant of public dollars to a defunct business.

a) Evidence

In 2003, the Corsicana Chamber of Commerce sent a letter of intent to the Chief Executive Officer of Gander Mountain outlining a sixteen-million-dollar incentive

package based on the opening of a Gander Mountain flagship store in Corsicana. The sixteen million was to go toward the building, fixtures, infrastructure, improvements, and land. In addition, the City of Corsicana would waive permit and hook-up fees and expedite the permitting process. Local banks had given preliminary approval of the incentive package pending finalization of certain aspects of the deal.

The RCDAs provided that the City and County determined it was necessary to enter into the Agreements with the Foundation "to implement certain components of the economic development program." The Foundation agreed to use all of the tax money it received solely for the purpose of repayment of debt associated with the funding of incentives offered solely to Gander Mountain. Further, each RCDA provided that it shall terminate upon repayment of the debt associated with the Gander Mountain incentive package.

The Interlocal Agreement filled in some details and clarified. It explained that the Foundation entered into a Development Agreement with Gander Mountain to develop a retail facility on a portion of the 132-acre development site. Pursuant to that agreement, the Foundation was obligated to obtain a construction loan for $10 million to finance the construction of a Gander Mountain facility. The terms of that loan were to be mutually acceptable to both Gander Mountain and the Foundation. The loan was to be secured by a pledge of sales tax granted to the Foundation, a first lien security interest on the land

and facility, and an assignment of the lease payments under the lease signed by Gander Mountain.

The Interlocal Agreement explained that the City and County determined "it is in the public interest to promote the economic development of the Gander Mountain facility" and grant a specified percentage of sales taxes generated by Gander Mountain and other businesses in the development site "to facilitate such economic development," meaning "the economic development of the Gander Mountain facility." The grants to the Foundation serve as security for the Foundation's construction loan obtained to build the Gander Mountain facility, and the sales tax fund is to be used for the sole and exclusive purpose of paying principal and interest on that loan. The Interlocal Agreement also stated that the City and County shall deposit the sales taxes into the Foundation's sales tax fund "following the completion and opening of Gander Mountain."

In support of their motion for partial summary judgment, Appellees presented affidavits of the city manager and the county judge stating that:

> The purpose of the grant of sales tax was to facilitate the development of the retail center and assist in the implementation of the economic development objectives of the City . . . and . . . County, including the development of the retail center, the creation of jobs, the establishment of a retail business within the City and County of a type not previously found in Corsicana, the generation of ad valorem tax revenues on the real property, inventory and equipment and the generation of sales tax revenues from the retail center and other businesses.
>
> . . . .

> The purpose of the grants of sales tax was to make payments on a construction loan, and then a permanent loan that replaced the construction loan.

The language in the affidavits echoed the 2004 agreements. The purpose of the sales tax grants was, generally, to facilitate development of the retail center, and the specific purpose was to repay the debt associated with construction of the Gander Mountain facility.

b) Analysis

All of the promised tax revenue, some of which was generated by other stores in the shopping center, was meant to pay for construction of the Gander Mountain facility. The agreements at issue did not provide for the grant of tax revenue to finance any other buildings or help any other businesses. Had the agreements provided that the tax grants would be used to build the entire retail center, rather than just one store, that might indicate the parties intended that the public purpose of the agreements was to build the entire retail center. Tying the obligation to pay to the construction of one specific store in the retail center signals that the public purpose meant to be achieved by these agreements was to have a Gander Mountain store in Corsicana that was open for business.

Furthermore, Appellees' obligation to help finance the construction of the Gander Mountain facility by contributing a portion of the sales tax revenue hinged on the opening of that store. If Gander Mountain had never opened, Appellees would not have been required to contribute to the sales tax fund at all. If, as Chase argues, the Foundation met

its obligation and the public purpose was achieved when the building was constructed, then construction of the building should have triggered Appellees' requirement to pay. Where payment is tied to opening the store, it follows that payment is tied to its continued operation.

In reviewing a summary judgment, we must indulge every reasonable inference in favor of the non-movant. *See City of Keller*, 168 S.W.3d at 824. Based on the language in the Agreements, it is not reasonable to infer that the parties intended that the public purpose to be achieved was the development of the entire shopping center as Chase would have us do. The record supports the trial court's implied finding that the public purposes which authorized Appellees' grants of public money was the opening and continued operation of the Gander Mountain store.

c) Extinguishment of the Public Purpose

Next, we consider Chase's argument that, contrary to the trial court's declarations, the closure of the Gander Mountain store did not extinguish the public purpose of the grants or render the Agreements void and unconstitutional. In support of this argument Chase contends that the public purpose of the tax grants was to develop a retail shopping center, it was developed, and Appellees received the benefit of their bargain. Chase also asserts that Appellees' unconditional payment obligations are not contingent on the Gander Mountain store remaining open. Relying on each RCDA's provision that it would terminate upon repayment of the debt associated with the Gander Mountain incentive

package, Chase asserts that since the multimillion-dollar debt to Chase has not been fully repaid, the trial court has judicially re-written the Agreements.

As explained above, the record supports the trial court's implied determination that development of the shopping center as a whole was not the public purpose behind the tax grants. But rather, the public purposes of the sales tax grants were to secure the presence and operation of a Gander Mountain store in Corsicana. Thus, during the time period Gander Mountain was open, the public purposes of the Agreements were being achieved. Accordingly, when Gander Mountain closed it was no longer possible to accomplish the public purposes of ensuring the presence and operation of Gander Mountain in Corsicana. The unpaid debt owed on the building does not have any bearing on the determination of the constitutionality of the Agreements. Thus, describing the determination that those Agreements are unconstitutional as an act of judicially re-writing the Agreements is a mischaracterization. The record supports the trial court's determination that the closure of Gander Mountain extinguished the public purposes of the tax grants. Accordingly, the first prong of the *Texas Municipal League* test is no longer being met. *See Tex. Mun. League*, 74 S.W.3d at 384.

*2) Public Control*

The second prong of the *Texas Municipal League* test requires that the governmental body retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment. *Id*. Chase contends that Appellees

controlled the economic development project and ensured the public purpose was accomplished by requiring the Foundation to obligate itself contractually to perform a function beneficial to the public. Chase asserts that the Agreements contain numerous controls "with respect to both the spending of public funds and the repayment of Chase's loan" to ensure the public purpose was carried out by the sales tax grant. Those purported controls are as follows:

> *The grant of sales tax is subject to the limitations set forth in the Agreements.
> *None of the money will come from ad valorem taxes; funded solely from sales taxes.
> *All of the money will be used solely to repay debt associated with Gander Mountain incentives.
> *Said incentives are limited to the construction of real property.
> *The Foundation will provide written reports tracking the funds.
> *Appellees have the right to request information regarding construction.
> *The Foundation must deposit grant proceeds into a separate account and use all interest earned by that account to pay the debt associated with the incentive.
> *The Foundation is prohibited from using the funds for any other purpose.
> *The Foundation is obligated to obtain a loan secured by sales tax revenue.
> *Appellees must segregate the sales taxes pledged and deposit them into the separate account maintained by the Foundation.
> *The grants are limited to sales taxes actually received from the Comptroller.
> *The Foundation must provide to Appellees any information reasonably requested regarding construction.

Based on the foregoing provisions in the Agreements, Chase asserts the

Agreements contain the following safeguards:

> (a) Appellees retain control of the sales taxes until they are transferred to a Foundation account that exists only to repay the loan;
> (b) The Foundation shall use 100% of the sales taxes to pay the principal and interest of the loan;
> (c) The loan can only be used to fund and finance the construction of the Gander Mountain store;
> (d) The grant of sales taxes is contingent on sales taxes actually being generated from the stores in the retail center; and
> (e) The sales tax grants are funded only after the sales taxes are actually received by Appellees from the State.

Appellees assert that "control," as used in this context, means that the government must retain sufficient rights to ensure that it can compel compliance, now and in the future, to ensure a public purpose is achieved. They contend that the transaction documents must contain actual benchmarks, rights, and remedies to ensure that the purpose is achieved, so that the transaction is not a mere unconditional grant of funds.

Control is defined as the power or authority to manage, direct, or oversee. *Control*, BLACK'S LAW DICTIONARY (11th ed. 2019). A public entity may retain public control over the use of its resources by entering into an agreement or contract that imposes an obligation on the recipient to perform a function benefiting the public. *See* Tex. Att'y Gen. Op. No. KP-0234 (2019) at *8-10. But the agreement should also contain some element of oversight by the governmental entity to ensure the public purpose is met. *Id*. Additionally, the agreement should provide rights or remedies in favor of the

governmental entity if the public purpose is no longer being achieved. *See* Tex. Att'y Gen. Op. No. KP-0423 (2023) at *5.

Terms that would constitute governmental control could include requiring a minimum term of occupancy or continued operations, occupancy by a specific tenant or business, and the creation and maintenance of employment positions; a recapture provision stating that if the private entity does not meet required performance standards, the governmental entity will have a right to seek reimbursement of the incentives that were provided; and an authorization for the governmental entity to terminate or modify the agreement if the recipient fails to comply with any terms of the agreement. *See* TEXAS MUNICIPAL LEAGUE ECONOMIC DEVELOPMENT HANDBOOK 148 (Amber McKeon-Mueller ed., 2022).

As set out above, Chase points out some safeguards in the Agreements. Where the money comes from and where it goes is specified. Importantly, the Foundation's use of the tax grant funds is restricted to repayment of the loan on the Gander Mountain facility. However, the Agreements do not provide rights or remedies in favor of Appellees should the Foundation fail to comply with these requirements. In other words, there are directions for funneling the money to repay the construction loan that would fulfill the public purposes, opening and operating Gander Mountain, but nothing in the Agreements addresses Appellees' recourse if the public purposes failed, that is, if Gander

Mountain closed. The Agreements focus on the money trail. They lose sight of the public purposes.

In furtherance of the public purpose of bringing a Gander Mountain store to Corsicana, the Agreements reference the loan on a building, the intended occupant of which was Gander Mountain. The RCDAs specifically say that the obligation to make the payments "shall be absolute and unconditional," and Appellees "shall make such payment without abatement, diminution or deduction regardless of any cause or circumstances whatsoever" until the loan is paid off.[5] The Interlocal Agreement provides that it will remain in effect until the latter to occur of the expiration or earlier termination of Gander Mountain's twenty-year lease or the full and final payment of all principal and interest on the loan. The absolute and unconditional obligation to pay off the loan connotes the absence of control. Furthermore, the imperative to pay required by the Agreements dovetails with the lease term providing that Gander Mountain is not required to continuously operate the premises "throughout or during any portion of the term" of the lease to leave no doubt that Appellees' obligation remains even if Gander Mountain is not doing business in Corsicana.

---

[5] A prior version of the Agreements provided that"[t]his agreement shall terminate upon repayment of the debt associated with the incentive package or cessation of operations of Gander Mountain." The record does not include evidence indicating why that last phrase was removed or identifying the party advocating for its removal.

The Agreements provide no recourse for Appellees if Gander Mountain vacates the store before the end of its lease or before the loan is paid in full. If the building is empty, or another business leases the building, that in no way advances the public purpose of bringing Gander Mountain to Corsicana. Yet, as illustrated by this case, there is no termination provision in the Agreements that Appellees can employ if they determine the public purposes are no longer being achieved. *See* Tex. Att'y Gen. Op. No. KP-0234, at *9-10.

We have been unable to discern any provisions in the Agreements that constitute an element of oversight by Appellees to ensure the public purposes are met, nor has Chase identified any. The right to mere document review does not provide authority to address irregularities. There is no provision allowing Appellees to back out for any reason, to change any terms, or seek reimbursement. The Agreements do not give Appellees any control over the shopping center, the Gander Mountain building, or the terms of either the loan or the lease.

We conclude that the Agreements do not include provisions sufficient to protect taxpayer money and ensure the public purposes are being met. Accordingly, the second prong of the *Texas Municipal League* test, which requires that the governmental entity retain control over the funds to ensure the public purposes are met and to protect the public's investment, has not been met here. *See Tex. Mun. League*, 74 S.W.3d at 384.

Appellees did not assert in their summary judgment that the third prong, requiring them to receive a return benefit, was not met. Thus, we need not address that prong.

Summation

Appellees were entitled to enter into agreements with the Foundation to further economic development in Corsicana. *See* TEX. CONST. art. III, § 52-a; TEX. LOC. GOV. CODE ANN. §§ 380.001, 381.004. However, because their Agreements failed to include provisions allowing Appellees to retain control over the funds to ensure that the public purposes are accomplished and to protect the public's investment, and because Gander Mountain's closing extinguished the public purposes for which the tax grants were created, the Agreements are not constitutional. *See Tex. Mun. League*, 74 S.W.3d at 384.

**Presumption of Validity**

Chase contends that the 2004 resolutions authorizing Appellees to enter into the economic development agreements cannot be challenged due to application of Section 51.003(a) of the Texas Local Government Code. That statute provides that a governmental act or proceeding of a municipality is conclusively presumed, as of the date it occurred, to be valid and to have occurred in accordance with all applicable statutes and ordinances if a lawsuit to annul or invalidate the act or proceeding was not filed on or before the third anniversary of the effective date of the act or proceeding. *See* TEX. LOC. GOV. CODE ANN. § 51.003(a).

Section 51.003(b)(1) provides that Section 51.003(a) does not apply to an act or proceeding that was void at the time it occurred. *Id*. § 51.003(b)(1). Here, because the parties' Agreements did not include adequate controls to protect taxpayers, the Agreements are unconstitutional. *See Tex. Mun. League*, 74 S.W.3d at 384. The rule generally is that unconstitutional laws are void ab initio. *See Ex parte E.H.*, 602 S.W.3d 486, 494 (Tex. 2020). Therefore, there is no applicable presumption of validity pursuant to Section 51.003(a). *See* TEX. LOC. GOV. CODE ANN. § 51.003(b)(1).

## Conclusion

The Agreements are unconstitutional and therefore not binding on the parties. *See Tex. Mun. League*, 74 S.W.3d at 384. Accordingly, Appellees met their burden to show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. *See Fielding*, 289 S.W.3d at 848. The trial court did not err in granting partial summary judgment and rendering a final declaratory judgment in favor of the City of Corsicana and Navarro County. We overrule Chase's sole issue.

We affirm the trial court's judgment.


STEVE SMITH
Justice

Before Chief Justice Gray,
    Justice Johnson, and
    Justice Smith
(Chief Justice Gray dissenting.)
Affirmed
Opinion delivered and filed January 11, 2024
[CV06]

